**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3673
No. 11-3799
_____

HIP HEIGHTENED INDEPENDENCE AND PROGRESS,
INC., a New Jersey Not-for-Profit Corporation; PETER
GIMBEL; UNITED SPINAL ASSOCIATION, a New York
Not-for-Profit Corporation,

Appellants in No. 11-3799


v.


THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY,

Appellant in No. 11-3673
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 07-cv-02982)
District Judge:  Honorable Stanley R. Chesler
_____

Argued May 23, 2012
Before:  RENDELL, FUENTES and HARDIMAN,
*Circuit Judges.*

(Filed:  September 11, 2012)

David J. Popiel, Esq. [Argued]
Community Health Law Project
185 Valley Street
South Orange, NJ 07079

Michael H. Isaac, Esq.
Robert B. Stulberg, Esq. [Argued]
Broach & Stulberg
One Penn Plaza
Suite 2016
New York, NY 10119
            *Attorneys for Appellees/Cross-Appellants*

Frank C. Morris, Jr. , Esq. [Argued]
Epstein, Becker & Green
1227 25th Street, N.W.
Suite 700
Washington, DC 20037

David W. Garland, Esq.
Epstein, Becker & Green
One Gateway Center
Newark, NJ 07102

George P. Cook, Esq.
Jason T. Watson, Esq.
Port Authority of New York & New Jersey

Suite 327
One Path Plaza
Jersey City, NJ 07306

Megan Lee, Esq.
Port Authority of New York & New Jersey
Litigation and Corporate Security
225 Park Avenue South
13th Floor
New York, NY 10003

*Attorneys for Appellant/Cross-Appellee*

———————

OPINION OF THE COURT
———————

HARDIMAN, *Circuit Judge*.

The Port Authority of New York and New Jersey (Authority) appeals the District Court's summary judgment, which orders the Authority to make modifications to its Grove Street Station to bring it into compliance with the Americans with Disabilities Act (ADA) of 1990, Pub. L. No. 101-336, 104 Stat. 378 (codified as amended at 42 U.S.C. §§ 12101–12213). We will vacate this judgment and remand the case for further proceedings. In a cross-appeal, Plaintiffs Heightened Independence and Progress, Inc. (hip), the United Spinal Association, and Peter Gimbel appeal the District Court's order dismissing their state-law claims on the basis that allowing such claims to proceed would violate the interstate compact between New York and New Jersey that

3

created the Authority.  That order of the District Court will be affirmed.

I

A

The Authority's wholly owned subsidiary, the Port Authority Trans-Hudson Corporation (PATH), operates the Grove Street Station in Jersey City, New Jersey, which is the subject of this lawsuit.  The Station has three levels—street, mezzanine, and platform—and two street-level entrance sides—east and west.  The Station can serve an eight-car train.  The mezzanine is not connected between the east and west sides.  One staircase connects the east mezzanine to a platform-level corridor, which leads out to the platform itself.

The Station was built in 1910, and in the 1970s PATH closed the east entrance and constructed two entrances on the west side.  As reflected in a 2001 report, in 2000 PATH planned to expand the Station to accommodate ten-car trains and persons with disabilities, a project that would have involved the construction of a new entrance and two elevators on the west side.  After September 11, 2001, and the resulting closure of two of the Authority's stations—Exchange Place in New Jersey and World Trade Center in Manhattan—ridership increased at the Grove Street Station.  Citing concerns about congestion and safety, PATH scrapped its renovation plans and undertook a different "fast track" project to reopen the east entrance.

Construction began in 2002 and concluded in 2005. The project involved building a new street-level pavilion and focused on renovating the connections between the street and

4

mezzanine levels on the east side only. The pavilion was built four inches above the sidewalk to comply with flood-plain construction requirements, and stairs were installed to connect the sidewalk and the building, which is also referred to as a "headhouse." The mezzanine was expanded to include a new fare-collection area. In addition, the platform corridor was reopened and the interior spaces connecting the three levels were rehabilitated. To complete the project, PATH purchased land adjacent to the Station from a private company.

In 2006, after PATH had finished construction, its engineering department concluded that elevator installation was feasible only on the west side of the Station. PATH believed that the east-side platform would be too crowded with an elevator, leading to safety concerns, and that construction on the east side would result in service disruption and possible flooding.

B

Plaintiffs filed this lawsuit in state court in 2007, and the Authority removed the case to the District Court. The complaint alleges that the Grove Street Station renovations triggered an obligation under the ADA to make the Station accessible to handicapped persons. It also alleges violations under New Jersey's Law Against Discrimination and certain New Jersey construction code provisions. The District Court dismissed the state-law claims, reasoning that, under the terms of the interstate compact that created the Authority, one state cannot unilaterally regulate the joint entity. *See hip, Inc. v. Port Auth. of N.Y. & N.J. (hip I)*, No. 07-2982, 2008 WL 852445, at \*4–6 (D.N.J. Mar. 28, 2008). Following further

5

proceedings and failed settlement attempts, the parties filed cross-motions for summary judgment.

The District Court entered summary judgment for Plaintiffs. During discovery, five schemes for making the east entrance ADA-compliant were produced, and the Authority's engineering department evaluated each of those schemes. The Court held that of the five, two—Schemes 4 and 5, which propose installation of a mezzanine-to-platform Limited Use Limited Access (LULA) elevator—are feasible. Consequently, the Court ordered the Authority to make the east entrance accessible. *hip, Inc. v. Port Auth. of N.Y. & N.J. (hip II)*, No. 07-2982, 2011 WL 3957532, at *3–5 (D.N.J. Sept. 6, 2011). The parties timely filed notices of appeal.

II

The ADA is a complex law codified in numerous statutes in the United States Code. Regulations have been promulgated by the Department of Transportation to implement those statutes. And pursuant to 42 U.S.C. § 12204, the Architectural and Transportation Barriers Compliance Board has issued a set of ADA Accessibility Guidelines (ADAAG). The Department of Justice produces an ADA "technical assistance manual," which provides still further guidance. The litigants here dispute the interpretation of several of these provisions as applied to the Grove Street Station construction project.

For example, and as a preliminary matter, the regulations and the ADAAG impose different obligations on different kinds of construction projects. "New facility" construction is distinguished from the "alteration" of existing facilities. *See* 49 C.F.R. §§ 37.41, 37.43; ADAAG §§ 4.1.3,

6

4.1.6; *Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 168–69 (3d Cir. 2006). The ADAAG also recognizes another category of construction, "addition," though it treats additions largely as alterations. ADAAG § 4.1.5. Generally, the ADA is more onerous on new construction projects than it is on alterations.

The District Court treated the Station renovations as an alteration but recognized that they "may also qualify as new construction and/or addition." *hip II*, 2011 WL 3957532, at *3. On appeal, Plaintiffs urge application of the new-construction rules, arguing that the "headhouse" is an entirely new structure. We reject this argument for two reasons. First, Plaintiffs' notice of appeal unambiguously specifies only the District Court's dismissal order, and not its summary judgment. *See* Fed. R. App. P. 3(c)(1)(B) ("The notice of appeal must . . . designate the judgment, order, or part thereof being appealed . . . ."). In fact, the notice of appeal indicates it appeals the dismissal order only "insofar as the order dismisses with prejudice the New Jersey state law claims raised in the Complaint." **(JA 5.)** Although there are circumstances under which we may review an order not specified in the notice of appeal, none is present in this appeal. *See Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 184 (3d Cir. 2010). While we have jurisdiction to review the summary judgment because the Authority has appealed that order, we will not entertain Plaintiffs' challenge to an order from which they failed to appeal.

Second, we think the District Court's characterization of the construction project as an alteration was sound. The regulations clearly distinguish between new construction and alterations, and because the obligations of the builder under each scheme are different, a given construction project must

be classified as one or the other. An alteration is "a change to an existing facility, including, but not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions." 49 C.F.R. § 37.3. The Grove Street Station project plainly falls under this definition, and it would be a stretch to claim that the Station, which existed in substantially the same form and for the same purpose prior to the renovation, is a new facility. Moreover, the modifications clearly exceeded the scope of the definitional exclusions from "alteration," such as "[n]ormal maintenance, reroofing, painting or wallpapering," because "they affect[ed] the usability of the building or facility." *Id.* Accordingly, in this case we will apply only the ADA provisions applicable to alterations.

As noted, this case comes to us on the appeal of an order resolving cross-motions for summary judgment. "When reviewing a district court's summary judgment decision in an ADA case, we exercise plenary review, applying the same standard as the district court." *Sulima*, 602 F.3d at 184 (citing *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006)). "Summary judgment is appropriate if, viewing the record in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.*; *accord* Fed. R. Civ. P. 56(a). In considering Plaintiffs' and the Authority's motions, we must "construe[] facts and draw[] inferences in favor of the party

8

against whom the motion under consideration is made."[1] *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011) (en banc) (internal quotation marks omitted).

## III

The touchstone of our analysis in this appeal is the Authority's obligation—triggered because it altered the Station—to make the Station accessible "to the maximum extent feasible." This requirement appears in 42 U.S.C. § 12147(a) and 49 C.F.R. § 37.43(a)(1), as well as in the "technical infeasibility" guideline, ADAAG § 4.1.6(1)(j), which is discussed in greater detail below.

> As used in this section, the phrase to the maximum extent feasible applies to the occasional case where the nature of an existing facility makes it impossible to comply fully with applicable accessibility standards through a planned alteration. In these circumstances, the entity shall provide the maximum physical accessibility feasible. Any altered features of

---

[1] We have appellate jurisdiction to review the denial of a motion for summary judgment where a cross-motion has been granted. *Levy v. Sterling Holding Co.*, 544 F.3d 493, 501 & n.6 (3d Cir. 2008); *see* 28 U.S.C. § 1291. The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

9

the facility or portion of the facility that can be made accessible shall be made accessible. If providing accessibility to certain individuals with disabilities (e.g., those who use wheelchairs) would not be feasible, the facility shall be made accessible to individuals with other types of disabilities (e.g., those who use crutches, those who have impaired vision or hearing, or those who have other impairments).

49 C.F.R. § 37.43(b). Where we discuss "feasibility" in this opinion, we do so only for the sake of expedience, recognizing that the actual standard—"to the maximum extent feasible"—is much more demanding.

Having discerned the appropriate regulatory framework that governs this appeal, we turn to the substantive disputes. The Authority proffers five reasons why it is entitled to summary judgment or, alternatively, summary judgment was wrongly entered for Plaintiffs. Two of these arguments—that the ADA did not require the Authority to make the platform accessible because it was not an "altered portion[]" of the facility, 42 U.S.C. § 12147(a), and that the Authority was excused from making ADA-compliant modifications because the cost of those changes would have been disproportionate, 49 C.F.R. § 37.43(e)–(f)—were not preserved in the District Court, so we will not consider them

10

here.[2] *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011). That leaves three of the Authority's arguments for us to resolve: first, the accessibility modifications ordered by the District Court could not have been accomplished because they would require the acquisition of subterranean property rights currently owned by Jersey City; second, the ordered modifications would have been "technically infeasible" under ADAAG § 4.1.6(1)(j), or, in the alternative, there are triable factual disputes regarding technical infeasibility; and third, the ordered modifications would not have been feasible because, if implemented, the Station might not have complied with National Fire Protection Association Standard 130 (NFPA 130), a fire-safety code the Authority has adopted. We hold that neither side is entitled to summary judgment on these issues.

---

[2] We note that were we to exercise our discretion to reach these unpreserved arguments, we would be unlikely to find either persuasive. Even the most cursory glance at the joint appendix's before-and-after photos of the platform-level tunnel and staircase indicates that the platform was part of the altered area, as those areas were clearly rehabilitated. Because the platform is part of the altered area, the "path of travel" disproportionate-cost limitations, *see* 49 C.F.R. § 37.43(e)(1), (f)(1); ADAAG § 4.1.6(2), do not apply. Additionally, the Authority has provided only estimates of the costs of implementing Schemes 4 or 5 now, and not how much those schemes would have cost if implemented during the period of construction, the latter being the relevant figures for the purposes of determining the Authority's obligations under the ADA.

11

In considering the parties' arguments under the ADA, it is important to bear in mind that the ADA's obligations are triggered at the time the construction is undertaken, not after it has been completed and litigation has commenced. *See Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 375 (2d Cir. 2008) (describing the ADA-compliance inquiry as "backward-looking"). Consequently, in assessing whether the Authority has violated the ADA, we evaluate the circumstances as of the time of construction. Questions of the feasibility of a proposed ADA-compliant modification, then, are directed not toward whether it would be feasible to execute the modification *today*, but rather whether it would have been feasible between 2002 and 2005. The District Court did not address this question, but, rather, chose from the options for reconstructing the station that were presented as "feasible after the fact." We cannot endorse this approach, and, accordingly, will remand for consideration of "feasibility" anew, as of the time of construction. The parties present us with numerous arguments as to why it would or would not have been feasible to make Grove Street Station ADA-accessible as part of the project at that time by installing an elevator to the platform level. These arguments were addressed to (and in some instances, ruled upon by) the District Court as part of the summary judgment motion proceedings. We will proceed to consider them.

A

The Authority's first preserved argument is that the ADA does not and cannot mandate a public transit authority to purchase subterranean property rights held by another party, which it would be required to do under Schemes 4 and 5. It frames this argument under ADAAG § 4.1.6(1)(j), which states that "if compliance with [the alteration

12

guideline] is technically infeasible, the alteration shall provide accessibility to the maximum extent feasible," and defines "technically infeasible" to mean, in relevant part, that "other existing physical or site constraints prohibit modification or addition of elements, spaces, or features which are in full and strict compliance with the minimum requirements for new construction and which are necessary to provide accessibility." ADAAG § 4.1.6(1)(j). We agree with the parties that the Authority bears the burden of proving technical infeasibility, as § 4.1.6(1)(j) acts as a kind of affirmative defense to otherwise applicable ADA compliance requirements. *Cf. Roberts*, 542 F.3d at 370–71 (discussing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)) (holding in a Title III ADA case that the plaintiff need only "mak[e] a facially plausible demonstration that the modification is an alteration" before the burden shifts to the defendant to show it is not an alteration); *Turner*, 440 F.3d at 614 (observing that a disabled employee must make a prima facie showing that a proposed accommodation is possible before the burden shifts to the employer to prove that the accommodation is unreasonable or unduly burdensome).

In *Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority (DIA v. SEPTA)*, 635 F.3d 87 (3d Cir. 2011), we considered a similar issue regarding whether a district court can order ADA compliance notwithstanding the fact that the defendant does not presently possess property rights necessary to make the ordered modifications. In that case, DIA sued SEPTA and the City of Philadelphia over accessibility barriers at two subway access points, the 15th Street Courtyard and City Hall Courtyard. *Id.* at 91. Early in the litigation, the city and DIA reached a settlement in which the city agreed to allow SEPTA to build

13

an elevator on its property at the 15th Street Courtyard and was dismissed from the suit as a result. *Id.* We affirmed the district court's order that SEPTA make both courtyards accessible. *Id.* at 97. Because compliance at the City Hall Courtyard also required use of the city's property, SEPTA argued that the Court could not order modification of that site without rejoining the city in the suit. *Id.* Ultimately rejecting SEPTA's argument for the necessity of joinder pursuant to Federal Rule of Civil Procedure 19, we reasoned that because the city had already settled with DIA with respect to the other location, the city "must [have] be[en] aware of DIA's current position," and that the fact that the issue had not yet arisen in the lower court meant it did not pose a significant hurdle to relief. *Id.* at 98. The majority of the panel concluded that "SEPTA [would] have to work with the City in complying with [its] decision, something the City ha[d] already agreed to do with respect to the 15th Street Courtyard." *Id.*

Of course here, unlike *DIA*, we have less of a clear indication that Jersey City is willing to cooperate with the Authority in making the station accessible. Though Plaintiffs have presented evidence that the mayor has indicated that the City could allow access to the property, it is the City Council that must vote on any such matter. Because we lack any similar indication from the City Council, we cannot assume that the Authority will be able to acquire the land rights it needs to implement Scheme 4 or 5. Accordingly, summary judgment need not be entered for the Authority, either.

As we see it, the mere fact that the Authority would now have to acquire land from a third-party is not sufficient to render the proposed accommodations per se infeasible. Indeed, in considering feasibility, as we must, as of the time of the original construction, the Authority may have been able

14

to negotiate for the use or ownership of the relevant land in the manner it had to facilitate construction of the headhouse for the east entrance. In light of the mayor's letter to the Plaintiffs, this may still be the case. There is, however, an open factual question as to whether the relief ordered by the District Court would now be ineffective because the City Council might refuse to negotiate a subterranean easement or sale to the Authority. On this point, we remand for further development of the record.

While it may be the case that joinder of the City becomes appropriate, as we see it, this issue can just as easily be resolved by introducing evidence of the City Council's intent to approve or deny the Authority's use or acquisition of the land required under Schemes 4 and 5. Until the Authority has demonstrated that the Council will not allow it to use the land, we cannot conclude that the proposed accommodations are infeasible within the meaning of the ADA.

B

The next two issues focus on the consequences of implementing Schemes 4 and 5. Because the appropriate inquiry under the ADA is backward-looking, and because Schemes 4 and 5 have been presented as prospective possibilities, those schemes may not be identical to those asserted by Plaintiffs at trial on remand. However, we recognize that the proposed modifications that might have been feasible between 2002 and 2005 may closely resemble the concept behind Schemes 4 and 5—LULA elevators to the platform—and therefore we proceed to address the feasibility concerns raised by the parties with respect to those schemes.

The parties dispute whether both of the schemes found feasible by the District Court require the removal of a load-bearing part of the Station or are otherwise technically infeasible. In addition to the definition set forth above, technical infeasibility exists where the modification "has little likelihood of being accomplished because existing structural conditions would require removing or altering a load-bearing member which is an essential part of the structural frame." ADAAG § 4.1.6(1)(j). "The structural frame shall be considered to be the columns and the girders, beams, trusses and spandrels having direct connections to the columns and all other members which are essential to the stability of the building as a whole." ADAAG § 3.5; *see* Americans With Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities, 56 Fed. Reg. 35,408, 35,428 (July 26, 1991) (responding to a comment on the proposed guidelines by opining that the "structural frame" definition does "not include wood or metal studs or joists used in light-frame construction of interior walls and floors"). As noted, technical infeasibility also encompasses situations where

16

"other existing physical or site constraints prohibit modification."

The parties did not develop a good factual record on this issue below. The Authority argues that "a roof structure" would need to be removed in Scheme 4 and avers there were "[f]actual conflicts" over the load-bearing-member issue in the District Court. Authority Br. 23–24. The Authority's reply brief provides further citations to record evidence that suggests, but stops short of explicitly stating, that in order to implement Schemes 4 or 5 the Station's "structural conditions would require removing or altering a load-bearing member which is an essential part of the structural frame." *See* Authority Reply Br. 16–18 (citing JA 415, 810, 1601–02). To offer just one example, the Authority's feasibility report on Plaintiffs' proposed Schemes 4 and 5 notes that those schemes "[m]ay require structural modifications to 'pressure slab' below stair at station entrance." (JA 1601–02.) The Authority claims this "pressure slab" is a load-bearing member falling within the technical infeasibility exception.

By contrast, Plaintiffs assert there is no record evidence that the removal of a load-bearing member would be necessary under either scheme and they present an expert who opines that Schemes 4 and 5 are feasible. The Authority counters that Plaintiffs' expert does not understand the meaning of technical infeasibility.

The lack of clarity in the record indicates there is a genuine dispute of material fact over whether a load-bearing member would need to be removed to make the east side accessible, whether Schemes 4 and 5 are otherwise technically infeasible, and whether they would have been infeasible had they been incorporated into the original

17

construction plans. Therefore, these issues must be submitted for trial.

C

Finally, the Authority contends that because Schemes 4 and 5 do not pass scrutiny under a fire-safety standard (NFPA 130), their implementation would not be "feasible" under the ADA. NFPA 130, titled "Standard for Fixed Guideway Transit and Passenger Rail Systems," contains numerous recommendations for designing rail systems to minimize risks associated with fire. The Authority highlights two of these recommendations as relevant to Schemes 4 and 5. First, as the District Court put it, "a bidirectional corridor must be at least 44 inches wide to ensure safe ingress and egress." *hip II*, 2011 WL 3957532, at *4. Second, according to the Authority, evacuation must be possible "from the most remote point on the platform to a point of safety in six minutes or less." Authority Br. 25. The District Court held that the corridor width in Schemes 4 and 5 exceeded the 44-inch minimum but the Court did not address the egress time restriction.

The parties disagree about the deference owed to NFPA 130 under the ADA's framework. Plaintiffs characterize it as a safety standard that the Authority voluntarily implements, which cannot trump the mandatory ADA. The Authority suggests NFPA 130 implementation is necessary under federal transportation regulations that mandate compliance with fire-safety standards. For its part, the ADA does not address where, if at all, safety standards fit within its regulatory framework.

We believe the "maximum extent feasible" test can account for such safety standards. "[T]he phrase to the maximum extent feasible applies to the occasional case where *the nature of an existing facility* makes it impossible to comply fully with applicable accessibility standards through a planned alteration." 49 C.F.R. § 37.43(b) (emphasis added); *see* 56 Fed. Reg. at 35,428 ("[E]xisting physical or site constraints prohibiting full and strict compliance . . . can result from legitimate legal requirements (e.g., a right of way agreement preventing construction of a ramp in front of a building)."). The ability to comply with safety standards relates to "the nature of an existing facility." We leave it to the District Court to determine in the first instance the weight to be accorded to these safety standards. Nevertheless, we think it likely that where compliance with a safety standard is required by law, a modification that would not comply with that safety standard is not "feasible." Even where the standard is not legally mandated, if it is uniformly implemented by the agency under ADA scrutiny and widely used by other transit agencies, a district court should be reluctant to order the agency to deviate from it.

We cannot discern the significance of NFPA 130 from the record before us, in large part because of the manner in which the issue was presented by the Authority to the District Court. The Authority did not raise NFPA 130 until after the Court heard argument on the motions for summary judgment (even if it did raise evacuation concerns more broadly), and the expert affidavits it submitted generically reference exit time but do not squarely address the six-minute limitation. Highly technical arguments require specificity in presentation, and while we cannot say that the Authority failed to raise this argument before the District Court, we

19

understand why the District Court believed the corridor-width issue to be the only one presented by NFPA 130. At the same time, Plaintiffs' expert was unfamiliar with NFPA 130 and offered no opinion on the Station's egress capacity. On this record, both the nature of the NFPA 130 requirement and whether Schemes 4 or 5 satisfy it are unclear and may be addressed by the District Court on remand.

In sum, there are three triable issues of fact related to the feasibility of Schemes 4 and 5 under § 12147(a) or § 4.1.6(1)(j): the acquisition of property rights from Jersey City; the technical infeasibility of making Grove Street Station ADA-accessible, and, in particular, whether either requires removing or altering a load-bearing member; and the compliance (and necessity of compliance) of those Schemes with NFPA 130. Some of these issues may be resolved prior to submission of the case to the jury as described more fully above.

IV

Plaintiffs' cross-appeal concerns the District Court's dismissal of their state-law claims on the basis that the application of state law to an agency operating under an interstate compact is permissible only if provided for in the compact. Because the Authority's compact does not so provide, we will affirm.

"A bi-state entity, created by compact, is 'not subject to the unilateral control of any one of the States that compose the federal system.'" *Int'l Union of Operating Eng'rs, Local 542 v. Del. River Joint Toll Bridge Comm'n*, 311 F.3d 273, 281 (3d Cir. 2002) (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 42 (1994)). This is so because interstate

compacts entered into with congressional consent under the Compact Clause function as a "surrender[] [of] a portion of their sovereignty" to an "'independently functioning part[] of a regional polity and of a national union.'" *Id.* at 276 (quoting *Hess*, 513 U.S. at 40). "Such a surrender of state sovereignty should be treated with great care, and the Supreme Court has stated that courts should not find a surrender unless it has been 'expressed in terms too plain to be mistaken.'" *Id.* (quoting *Jefferson Branch Bank v. Skelly*, 66 U.S. 436, 446 (1861)). "Our role in interpreting the Compact is, therefore, to effectuate the clear intent of both sovereign states, not to rewrite their agreement or order relief inconsistent with its express terms." *Id.* (citing *Texas v. New Mexico*, 462 U.S. 554, 564–65 (1983)).

In *Delaware River*, we considered a compact that did not contain the "concurred in" language that is frequently found in interstate compacts to allow a state to modify a compact with legislation, provided its partner state passes similar legislation. *Id.* Finding the absence of that language significant, we nonetheless reviewed various approaches taken by federal and state courts interpreting "concurred in" clauses in compacts. Some courts require an express statement of intent by both state legislatures to modify the compact, and other courts permit "complementary or parallel" actions of two state legislatures to imply the intent to modify the compact. *Id.* at 276–79. Ultimately we applied the "express intent standard" and found there was no evidence of intent by the states "to amend the Compact or apply their collective bargaining laws to the" bi-state entity. *Id.* at 280.

The compact between New York and New Jersey that created the Authority provides that "[t]he port authority shall have such additional powers and duties as may hereafter be

delegated to or imposed upon it from time to time by the action of the legislature of either state *concurred in* by the legislature of the other." N.J. Stat. Ann. § 32:1-8 (emphasis added) (codifying the compact); N.Y. Unconsol. Law § 6408 (same); *accord* N.J. Stat. Ann. § 32:1-4; N.Y. Unconsol. Law § 6404. However, there is no dispute that the New Jersey laws relied upon by Plaintiffs do not purport to regulate the Authority, nor do Plaintiffs contend that there is an implied agreement based on parallel legislation to amend the compact.

Instead, relying on New York case law, Plaintiffs urge the panel to distinguish between "internal operations" and "external conduct" of the Authority in applying these compact principles. *See Agesen v. Catherwood*, 260 N.E.2d 525, 526–27 (N.Y. 1970); *see also Dezaio v. Port Auth. of N.Y. & N.J.*, 205 F.3d 62, 65 (2d Cir. 2000) (discussing *Agesen* but declining to apply New York state employment discrimination laws to the Authority, implicitly assuming that employment matters relate to the internal operation of the Authority). Specifically, Plaintiffs claim that while a state cannot regulate the Authority's internal operations on its own, it can regulate the external conduct of the agency. Plaintiffs define external conduct as actions relating to "health and safety." *See Agesen*, 260 N.E.2d at 526–27.

There is no basis in Third Circuit precedent for the internal-external distinction, nor would such a distinction necessarily be well-founded.[3] But we need not consider the

_____

[3] In *Eastern Paralyzed Veterans Ass'n, Inc. v. City of Camden (EPVA)*, 545 A.2d 127 (N.J. 1988), the New Jersey Supreme Court declined to adopt the internal-external distinction because "[o]nly when the compact itself recognizes the jurisdiction of the compact states may it be

22

matter, for even if such a distinction were adopted, the decision of whether to comply with an anti-discrimination statute in constructing a facility is best described as an "internal operation" because the decision does not relate to anything external to the Authority or to health or safety. The Authority's decisions on station construction do not threaten physical harm to New Jersey's citizens. Consequently, just as the *Dezaio* Court found that New York employment discrimination laws could not be applied to the Authority, so too is New Jersey barred from applying its civil rights and construction code statutes to the Authority. *Cf. Am. Honda Fin. Corp. v. One 2008 Honda Pilot*, 878 N.Y.S.2d 597, 600 (N.Y. Sup. Ct. 2009) (suggesting that the Authority's claimed vehicular lien was an external matter not protected by its claim to autonomy but avoiding that holding because the Authority conceded the applicability of the state statute).

---

subject to single-state jurisdiction." *Id.* at 132. Plaintiffs claim that *Delaware River* is fundamentally inconsistent with this case, but the *Delaware River* Court, while rejecting *EPVA*'s adoption of the implicit "complementary or parallel test," cited with approval *EPVA*'s holding that an express statement attempting to regulate a bi-state entity was insufficient to modify a compact "without 'some showing of agreement by both states to the enforcement of the [state law].'" 311 F.3d at 280–81 (quoting *EPVA*, 545 A.2d at 133–34). Accordingly, even though we do not recognize implicit modifications of an interstate compact as the New Jersey Supreme Court might, both jurisdictions require evidence of mutual intent to alter a compact and regulate the bi-state agency, regardless of whether the action taken by the agency is "external" or "internal."

Plaintiffs also contend that "the Compact contains no express surrender of state sovereignty regarding external relations, including, among other things, barrier-free construction codes and related civil rights statutes," the subjects of Plaintiffs' state-law claims, meaning the Authority lacks the power to avoid the reach of these New Jersey laws. Plaintiffs Br. 34. This argument misapprehends the notion of sovereignty surrender discussed in *Hess* and *Delaware River*. While a court must be hesitant to find a surrender of sovereignty where it is ambiguous, here there is no question the states intended to create the Authority, and such surrender has already been recognized by numerous courts, including the United States Supreme Court in *Hess*. By expressly creating the bi-state entity, New York and New Jersey relinquished all control over the Authority unless otherwise stated in the compact. Under *Delaware River*, that autonomous entity cannot be unilaterally regulated by New Jersey.

V

For the foregoing reasons, we will vacate the summary judgment of the District Court, we will affirm its dismissal of the state-law claims, and remand for further proceedings consistent with this opinion.