**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1783**

---

METROPOLITAN WASHINGTON AIRPORTS AUTHORITY,

Plaintiff − Appellee,

v.

GARY G. PAN, Commissioner of the Virginia Department of Labor and Industry,

Defendant – Appellant.

------------------------------

THE DISTRICT OF COLUMBIA,

Amicus Supporting Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge.  (1:21−cv−01245−MSN−WEF)

---

Argued:  March 19, 2024                    Decided:  July 2, 2024

---

Before DIAZ, Chief Judge, and HARRIS and HEYTENS, Circuit Judges.

---

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Harris and Judge Heytens joined.

---

**ARGUED:**  Erika L. Maley, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant.  Bruce P. Heppen, METROPOLITAN WASHINGTON AIRPORTS AUTHORITY, Washington, D.C., for Appellee.  **ON**

**BRIEF:**  Jason S. Miyares, Attorney General, Leslie Haley, Deputy Attorney General, Joshua E. Laws, Senior Assistant Attorney General, Andrew N. Ferguson, Solicitor General, M. Jordan Minot, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant.  Joseph W. Santini, FRIEDLANDER MISLER, PLLC, Washington, D.C., for Appellee.  Brian L. Schwalb, Attorney General, Caroline S. Van Zile, Solicitor General, Ashwin P. Phatak, Principal Deputy Solicitor General, Lucy E. Pittman, Senior Assistant Attorney General, Elissa R. Lowenthal, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus Curiae.

———————

2

DIAZ, Chief Judge:

This appeal is about the relationship between the Commonwealth of Virginia and the Metropolitan Washington Airports Authority—an entity created jointly by Virginia and the District of Columbia to manage the area's two airports. The district court held that Virginia could not enforce its workplace safety laws against the entity because it didn't reserve that power when it created the Authority. We agree and affirm the judgment.

I.

A.

We've previously detailed the history of the Authority in another case. *See Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 156–59 (4th Cir. 2018). Federal agencies long operated Dulles International Airport and what is now the Ronald Reagan Washington National Airport. *See id.* at 156–57. But by 1984, the federal government had grown concerned about how to fund needed improvements to both airports. *Id.* at 157. Congress had twenty-five years earlier given advanced approval to interstate compacts for the management of airports, *id.* at 157 (citing Act of Aug. 11, 1959, Pub. L. No. 86-154, 73 Stat. 333), and thus a commission created by the Secretary of Transportation recommended transferring both airports to an independent entity, *id*.

In 1985, Virginia and the District of Columbia passed reciprocal statutes creating the Authority and granting it power to acquire Dulles and National from the federal

3

government (the "Compact").[1]  *See* D.C. Code § 9-901 *et seq.*; Va. Code Ann. § 5.1-152 *et seq.*  The Compact grants the Authority broad powers, including to "adopt . . . by-laws for the regulation of its affairs and the conduct of its business," to "plan, establish, operate, develop, construct, enlarge, maintain, equip, and protect the airports," and to adopt regulations to carry out these powers.  D.C. Code § 9-905(a); *accord* Va. Code Ann. § 5.1-156(A).  It also provides that the Authority "shall be independent of the Commonwealth and its local political subdivisions, the District of Columbia, and the federal government in the performance and exercise of the airport-related duties and powers."  D.C. Code § 9-905(b); *accord* Va. Code. Ann. § 5.1-156(B).

In 1986, Congress passed the Transfer Act authorizing the transfer of operating responsibility of Dulles and National airports to the Authority.  Pub. L. No. 99-591, § 6001,101 Stat. 3341, 376–88 (1986) (codified as amended at 49 U.S.C. §§ 49101–49112).[2]  The Act recognizes that the Authority has certain powers, including those "conferred upon it jointly" by Virginia and the District.  49 U.S.C. § 49106(a)(1).  It also provides that Virginia shall "have concurrent police power authority over the Metropolitan Washington Airports."  *Id.* § 49111(c).

---

[1] Though there's a dispute over whether the statutory scheme is an interstate compact under the Compact Clause—an issue we don't reach—we refer to it as a compact in the colloquial sense.

[2] The statute is formally titled the Metropolitan Washington Airports Act, but it's more commonly referred to as the Transfer Act.  *See Kerpen*, 907 F.3d at 157; *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 255 n.1 (1991).

4

The Authority is governed today by a board of directors consisting of seven members appointed by the Governor of Virginia, four by the Mayor of the District, three by the Governor of Maryland, and three by the President subject to Senate confirmation. *Id.* § 49106(c).

## B.

Virginia and the Authority have long disputed the extent to which Virginia can enforce its workplace safety laws against the Authority. Since at least 2006, the Authority has claimed that the Virginia Department of Labor and Industry has no power to supervise the workplace safety of the Authority's employees. At the same time, the Authority has voluntarily complied with the Department's periodic inspections and requests to correct violations of Virginia safety regulations.

But this longstanding practice of cooperation ended after Virginia amended its statutory and regulatory scheme in 2016 to authorize the Department to levy monetary penalties for violations of its safety laws. Va. Code. Ann. § 40.1-2.1; 16 Va. Admin. Code § 25-60-260.

In the spring of 2020, an Authority employee was injured while performing maintenance on the air filter and belt of a fan. The fan began to rotate while his hand was inside, resulting in tendon damage and the partial amputation of a finger.

The Department investigated the incident and concluded that the Authority violated Virginia safety regulations governing the procedure for isolating a machine's energy source before performing maintenance. Exercising its newfound power to issue monetary penalties, it assessed $26,094 in civil penalties against the Authority for this violation.

5

C.

The Authority pursued an administrative proceeding to contest the Department's power to enforce these civil penalties. The Department's adjudicator found that the Authority was subject to Virginia workplace safety regulations, and the Department's Commissioner adopted that decision.

The Authority then sued the Commissioner in federal court seeking injunctive and declaratory relief that, given its status as an interstate compact entity, it wasn't subject to Virginia workplace safety regulations. The parties cross-moved for summary judgment, and the district court ruled for the Authority.

The court reasoned that because the Authority's governing statutes are "silent as to the authority of the states to enforce their labor laws," Virginia "voluntarily surrendered its ability to exercise unilateral regulatory authority over [the Authority's] facilities" when it created the Authority. *Metro. Wash. Airports Auth. v. Pan*, 679 F. Supp. 3d 494, 499 (E.D. Va. 2023). It noted that the statutes contain "specif[ic] areas where Virginia maintained its concurrent regulatory authority alongside [the Authority]—such as in policing, where the compact ensures Virginia's Department of State Police may 'exercise the same power upon [the Authority's] Facilities as elsewhere in the Commonwealth.'" *Id.* at 500 (quoting Va. Code. Ann § 5.1-158(C)). So it reasoned that because the statutes don't include "similar provision[s] expressing [Virginia's] maintenance of regulatory authority over labor conditions," Virginia could not "enforc[e] unilateral workplace safety regulations." *Id.*

6

The court also rejected the Department's argument that the District of Columbia "cannot join an interstate compact because it is not a state." *Id.* at 500. It noted that whether the District is a state "within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved." *Id.* (quoting *District of Columbia v. Carter*, 409 U.S. 418, 420 (1973)). And it found the District to be a state for purposes of the Compact Clause because doing so reflected Congress' intent in authorizing the transfer of control of the airports to the Authority. *Id.* at 500–01.

The Department appeals that order.

## II.

We review the district court's grant of summary judgment for the Authority de novo. *Young v. Equinor USA Onshore Props., Inc.*, 982 F.3d 201, 205 (4th Cir. 2020).

The Department raises three issues on appeal. First, it contends that the provisions of the Transfer Act and Virginia Code granting it "police power authority" over the airports allow it to enforce its workplace safety regulations against the Authority. Second, it argues that nothing in the Compact preempts Virginia safety regulations. Third, it argues that, because the District of Columbia isn't a state, the Compact isn't subject to the Compact Clause and thus doesn't preempt state law. We address each of these issues below.

## A.

We begin with the issue we don't decide—whether the Compact is subject to the Compact Clause. The Compact Clause requires congressional consent over certain

agreements between states.  U.S. Const. art. I, § 10, cl. 3; *see Cuyler v. Adams*, 449 U.S. 433, 440 (1981) (explaining that consent is required only if the agreement encroaches upon federal supremacy).  If Congress consents, the compact "transforms . . . into a law of the United States" and preempts state law.  *See Cuyler*, 449 U.S. at 438, 440.

The Department argues that because the District of Columbia isn't a state, the Compact doesn't create an interstate compact under the Compact Clause, and thus doesn't become federal law capable of preempting Virginia's workplace safety regulations.  But we fail to see how that issue matters to the resolution of this appeal.

The Transfer Act—which authorized the transfer of operating responsibility of Dulles and National to the Authority—is a federal statute, and it independently recognizes the Authority's power, including "the powers and jurisdiction . . . conferred upon it jointly by the legislative authority of Virginia and the District of Columbia."  49 U.S.C. § 49106(a)(1); *accord id.* § 49106(b) (noting the Authority's power to "acquire, maintain, improve, operate, protect, and promote" the airports).  Thus, even assuming the Department is right that the District's agreements with other states aren't subject to the Compact Clause,[3] the Compact has the force of federal law by virtue of the Transfer Act.

Moreover, where the Compact Clause applies, it merely requires that Congress consent to the agreement.  It doesn't affirmatively *grant* any authority for states to enter into agreements with other jurisdictions.  *Cf. Cuyler*, 449 U.S. at 440 ("Congressional

---

[3] Though we express no view on the merits of this argument, we have previously described the Compact as a "textbook example of an interstate compact."  *Kerpen*, 907 F.3d at 159.

consent is not required for interstate agreements that fall outside the scope of the Compact Clause."). Thus, where the Compact Clause doesn't apply, the Constitution doesn't "limit the variety of arrangements which are possible through the voluntary and cooperative actions of individual States." *See New York v. O'Neill*, 359 U.S. 1, 6 (1959).

So we're satisfied that whether the Compact is subject to the Compact Clause has no bearing on this appeal.

## B.

The Department primarily argues that the Compact expressly reserves its power to enforce Virginia's workplace safety regulations against the Authority. It cites complementary provisions of the Transfer Act and Virginia Code providing that Virginia shall have "concurrent police power authority over the Metropolitan Washington Airports." 49 U.S.C. § 49111(c); Va. Code. Ann. § 5.1-158(A). And because the ordinary meaning of the term "police power" includes safety regulations, the Department asserts that these provisions grant it power to enforce Virginia's regulations against the Authority.

## 1.

Before reaching the merits of this argument, we pause to consider whether the Department preserved it. We start with the basic premise that, "absent exceptional circumstances, . . . we do not consider issues raised for the first time on appeal." *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014) (cleaned up). Still, we consider "any theory plainly encompassed by the submissions in the underlying litigation." *Id.* at 288 (cleaned up). Parties are free to pursue "variations on arguments made below . . . so long as the

9

appealing party asked both courts to evaluate the same fundamental question." *De Simone v. VSL Pharms., Inc*., 36 F. 4th 518, 528 (4th Cir. 2022) (cleaned up).

The Department's arguments on appeal are markedly different from those made to the district court.  In its motion for summary judgment, it argued that the statutes creating the Authority don't limit the Department's regulation of the Authority and "anticipate" such regulation.  Defendant's Brief in Support of Motion for Summary Judgment at 12, *Pan*, 679 F. Supp. 3d 494 (No. 1:21-cv-01245), ECF No. 17.  And it said that nothing in the statutes "purport to exempt the [Authority] from regulation by Virginia." *Id.* at 13.  But it didn't mention the "police power" provisions in the Transfer Act or Virginia code, nor did it cite to those provisions.

On appeal, the Department takes a new approach.  Not only does it argue that nothing in the Compact expressly *limits* its authority over the Authority, it also argues that the "police power" provisions in the Transfer Act and Virginia Code specifically *grant* the Department power to enforce its regulations against the Authority.

We think this shift is more than a "variation" on the arguments made in the district court, as the Department never argued that the Compact affirmatively granted it the power to enforce Virginia safety regulations.  Thus, we don't think the Department presented the "same fundamental question" to the district court.

Nor are we persuaded by the Department's suggestion that the issue is preserved because "the district court decided it."  Reply Br. at 5.  The district court explained that, unlike any mention of workplace safety laws, the Compact expressly "maintained

10

[Virginia's] concurrent regulatory authority alongside [the Authority]" in the area of "policing." *Pan*, 679 F. Supp. 3d at 500.

Relying on this passage, the Department argues that the district court considered its police power argument but misconstrued the provision as applying only to criminal law enforcement. But this is a strained interpretation of the court's analysis.

The district court quoted section 5.1-158(C) of the Virginia Code, which provides that the Virginia "Department of State Police shall exercise the same powers upon [the Authority's] Facilities as elsewhere in the Commonwealth." That provision plainly refers only to criminal law enforcement, rather than a broader police power of the kind argued for here. And because the court didn't cite or otherwise discuss section 5.1-158(A)—the provision referencing "police power"—we're confident that it didn't consider or decide the issue that the Department now presses on appeal.

Thus, we agree with the Authority that the Department didn't preserve this issue.

2.

But even if the issue were preserved, we reject it on the merits.

Recall that the Transfer Act provides that Virginia maintains "concurrent police power authority over the Metropolitan Washington Airports." 49 U.S.C. § 49111(c). We agree with the Department that a state's "police power" encompasses its ability to legislate in the areas of health and safety, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). Because we typically assume that such a term carries its established meaning, *McDermott Int'l, Inc v. Wilander*, 498 U.S. 337, 342 (1991), and the Authority doesn't suggest otherwise, we'll assume that the statutes used the phrase consistent with this meaning.

11

Still, textual clues indicate that Congress intended to exclude the Authority from the reach of Virginia's police powers. The Transfer Act refers to Virginia's police power authority over the "Metropolitan Washington Airports." 49 U.S.C. § 49111(c). And it defines that phrase independently of its definition of the Authority. *Compare id.* § 49103(1) ("'Airports Authority' means the Metropolitan Washington Airports Authority, a public authority created by Virginia and the District of Columbia . . . ."), *with id.* § 49103(3) ("'Metropolitan Washington Airports' means Ronald Regan Washington National Airport and Washington Dulles International Airport.").

We must give effect to these separately defined terms. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) ("When Congress takes the trouble to define the terms it uses, a court must respect its definitions as virtually conclusive." (cleaned up)). Congress's choice to omit the Authority from § 49111(c) suggests that it didn't intend to grant Virginia broad powers over it. *Dean v. United States*, 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

The Department suggests that § 49111(c)'s grant of police power over the "Metropolitan Washington Airports" *includes* "conduct perpetrated by [the Authority]" at the airports. Reply Br. at 11. But again, the statute indicates otherwise.

Where Congress wanted a provision to apply to both the "Metropolitan Washington Airports" and the Authority, it used both terms. *See* 49 U.S.C. § 49111(b) ("The Metropolitan Washington Airports *and* the Airports Authority are not subject to the

12

requirements of any law solely by reason of the retention by the United States Government of the fee simple title to those airports." (emphasis added)).   Thus, we assume that Congress's use of only the former phrase in § 49111(c) was intentional.  *Dean*, 556 U.S. at 573.

The Virginia Code provision has similar indicators.[4]   Though it doesn't define "Metropolitan Washington Airports," it does define the "Authority."  Va. Code Ann. § 5.1-152.  And it uses the phrase "the Authority" in nearly every section.  Yet the subsection concerning Virginia's "police power" authority refers only to the "Metropolitan Washington Airports," and specifically cross-references the Transfer Act.  *Id.* § 5.1-158(A).  Thus, we read the Virginia Code provision as consistent with our understanding of the Transfer Act.

That's not to say the Department is helpless to regulate what happens at the airports. Consistent with our ruling here, the Supreme Court of Virginia has understood the Transfer Act's grant of police powers as permitting Virginia to enforce its employment laws against *private employers* at the airports.  *Singleton v. Int'l Ass'n of Machinists, Loc. Lodge No. 1747*, 397 S.E.2d 856, 859 (Va. 1990).  But that the police power provision omits any reference to the Authority implies that the Department can't enforce its regulations against the entity.  *See Dean*, 556 U.S. at 573.

---

[4] The Authority argues that the Virginia Code's "police power" provision isn't part of the Compact because it wasn't adopted by the District of Columbia.  But we need not consider that argument, as the Transfer Act is a federal statute that separately imposes the same requirement.  We reference the Virgina Code provision here only to underscore that the Virginia legislature designed this provision to be consistent with the Transfer Act.

And we aren't persuaded by the stray remarks in *Singleton* that the Department highlights to support its view. *Singleton* concerned whether a private employer at National Airport could require that its employee join a union—a practice that federal law permitted, but Virginia law prohibited. 397 S.E.2d at 857.

In arguing that federal law should control, the defendants in *Singleton* cited provisions of the Transfer Act providing that the Authority must "continue all collective bargaining rights" enjoyed by federal airport employees before the transfer of the airports to the Authority. *Id.* at 859 & n.2 (cleaned up). The defendants argued that although the statute referenced only federal employees, extending the same rights to similarly situated private employees at the airport would be consistent with Congress's intent to preserve the status quo. *See* Brief of Appellees at 7–8, *Singleton*, 397 S.E.2d 856 (No. 900142), 1990 WL 10095889.

But the Supreme Court of Virginia rejected this argument, stating that "the exclusion of one class of employees, *i.e.*, former federal employees at National Airport, from the transfer of police power to Virginia evinces an intent to include all other classes of employees within the Act, *i.e.*, employees of private employers." *Singleton*, 397 S.E.2d at 859.

The Department reads this passage to suggest that the Transfer Act specifically bars Virginia's police powers from applying to this aspect of the Authority's employment relationships. And from this, the Department reasons by implication that Virginia has police power to enforce its safety regulations against the Authority because nothing in the Transfer Act similarly bars that power.

Though *Singleton* can be read that way, we think the court was making the more limited point that because the Transfer Act didn't mention private employment relationships, it didn't similarly extend federal collective bargaining rights enjoyed by former-federal employees to private employees at the airports.

The Transfer Act addressed the unique problem of the rights of federal employees that would, upon transfer, become employees of the Authority. And it restricted *the Authority* from altering the collective bargaining rights that those employees enjoyed pre-transfer. 49 U.S.C. § 49104(a)(6)(D) ("*The Airports Authority* shall continue all collective bargaining rights enjoyed by employees of the Metropolitan Washington Airports before June 7, 1987." (emphasis added)). We think this language is best read as a restriction on the Authority, rather than an exclusion of Virginia's police power.

On this understanding, *Singleton* aligns with our conclusion that the "police power" provisions in the Transfer Act and Virginia Code grant Virginia power over private companies operating at the airport, and not the Authority itself.

That said, we do not mean to say that Virginia law may never be applied against the Authority. The Compact explicitly makes the Authority "liable for its contracts and for its torts . . . in accordance with the law of the Commonwealth of Virginia." D.C. Code § 9-922(B); Va. Code Ann. § 5.1-173(B). And it grants Virginia courts original jurisdiction over such disputes. D.C. Code. § 9-922(a); Va. Code Ann. § 5.1-173(A).[5] But that there's

---

[5] This provision provides that Virginia courts "shall have original jurisdiction of all actions brought by or against the Authority, which courts shall in all cases apply" Virginia law. D.C. Code § 9-922(a); Va. Code Ann. § 5.1-173(A). The Department suggests that this broadly subjects the Authority to Virginia law—another argument it forfeited by

no similar provision subjecting it to Virginia workplace safety regulations further suggests that the Compact excluded this authority.

The Department notes that the Compact contains a few provisions specifically exempting the Authority from Virginia and D.C. law. *See, e.g.*, Va. Code. Ann. § 5.1-174 (exempting the Authority from the state's procurement laws); D.C. Code § 9-923 (same); Va. Code Ann. § 5.1-172 (exempting the Authority from the state's tax laws); D.C. Code § 9-921 (same). And it suggests that these provisions show that where the Compact wanted to exclude Virginia law, it did so explicitly.

But "redundancies are common in statutory drafting—sometimes in a [legislative] effort to be doubly sure, sometimes because of [a legislature's] inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Barton v. Barr*, 590 U.S. 222, 239 (2020). In other words, sometimes, "the better overall reading of a statute contains some redundancy." *Id.* (quoting *Rimini Street, Inc v. Oracle USA Inc.*, 586 U.S. 334, 346 (2019)). We think that's the case here.

## C.

Finally, the Department contends that it can enforce its workplace safety laws against the Authority because nothing in the Compact preempts Virginia law. But we think the Authority's status as a multijurisdictional entity with broad powers does just that.

---

failing to make below. *See supra* Part II.B.1. In any event, we think this provision is best read not as applying all Virginia law against the Authority, but permitting Virginia courts to hear all claims for which the Authority is subject—such as for its torts and contracts.

Multijurisdictional entities like the Authority "address interests and problems that do not coincide nicely either with the national boundaries or with State lines." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40 (1994) (cleaned up). They "owe their existence to state and federal sovereigns acting cooperatively, and not to any one of the United States." *Id.* at 42 (cleaned up). As a result, they "shift[] a part of a state's authority to . . . the agency the several states jointly create," and are not "subject to the unilateral control of any one of the States." *Id.* (cleaned up).

Applying these principles, the Third Circuit has held that where two states jointly create an entity by interstate compact, they "relinquish[] all control over the [entity] unless otherwise stated in the compact." *HIP Heightened Indep. & Progress, Inc. v. Port Auth. of N.Y. & N.J.*, 693 F.3d 345, 358 (3d Cir. 2012). In that case, the court considered whether New Jersey construction and discrimination laws applied to the Port Authority of New York and New Jersey—a bistate entity. *Id.* at 350, 356. New Jersey argued that its laws applied because it had not expressly surrendered its authority in the compact. *Id.* at 358. But the court disagreed, finding that any authority not reserved in the compact was surrendered. *Id.*

So too in *Delaware River Joint Toll Bridge Commission v. Secretary Pennsylvania Department of Labor and Industry*, 985 F.3d 189 (3d Cir. 2021). There, the Third Circuit considered whether Pennsylvania could enforce its construction permitting requirements against a bistate entity that was building a new office in the state. *Id.* at 191–92. Relying on *HIP*, the court held that Pennsylvania law didn't apply because the two states "relinquished all control" over the entity. *Id.* at 195 (cleaned up). And it explained that

17

the text of the compact "unambiguously cede[d]" this power by granting the entity broad powers over its facilities.[6] *Id.* at 195–96.

These cases have obvious application here, and we find them persuasive.[7] They recognize that, by the very nature of a bistate entity, neither state can enforce its laws against the entity, even for conduct within their borders, unless that authority is expressly provided for in the compact. So we agree with the Authority that by jointly creating the Authority with the District, Virginia relinquished its control over the Authority except as otherwise provided in the Compact.

The Department, relying on the Supreme Court's decision in *Tarrant Regional Water District v. Herrmann*, 569 U.S. 614 (2013), urges us to part ways with the Third Circuit. *Tarrant* considered whether, under a multistate compact apportioning water rights to a river, a Texas agency could acquire water within Oklahoma's borders in violation of Oklahoma law. *Id.* at 618. Although the compact granted "equal rights" to a portion of water that spanned multiple states, it didn't speak to whether a state was permitted to divert water located within the borders of another state. *Id.* at 627.

The Court relied on "principles of contract law" to determine the states' intent. *Id.* at 628. And as one piece of evidence of their intent, the Court acknowledged the

---

[6] The compact gave the entity the power to "acquire, own, use, lease, operate, and dispose" of property as well as power over "all other matters in connection with any and all improvements or facilities." *Id.* (cleaned up).

[7] That they involved two states, rather than a state and the District of Columbia, is of no moment. Regardless of whether the Compact is subject to the Compact Clause, we see no reason to apply different interpretive principles to agreements between jurisdictions.

18

"background notion that a State does not easily cede its sovereignty." *Id.* at 631. Because states have long been understood to possess an "absolute right to all their navigable waters," the Court interpreted the silence in the compact as preserving each state's right to the water within its borders. *Id.* at 631–32 (cleaned up).

The Department extrapolates from *Tarrant* the general principle that because states don't easily cede their sovereign powers, silence in a compact should be read as preserving all sovereign powers not explicitly surrendered. But we don't think *Tarrant* applies so broadly.

*Tarrant* involved a multistate compact formed to distribute water rights—not a compact creating a joint entity. In the former, establishing specific rules that each state agrees to, it makes more sense to interpret the compact as not otherwise interfering with a state's traditional sovereign powers. By contrast, where multiple sovereigns jointly create a separate entity and grant it broad authority to make rules in furtherance of a common mission, we can't say that the same background principle exists. Rather, if any background principle exists, we think it's the commonsense rule that joint creation of the entity "shifts a part of a state's authority" to the entity, which is then not "subject to the unilateral control" of either state. *Hess*, 513 U.S. at 42 (cleaned up). In short, because *Tarrant* considered a different type of compact, we don't think it carries the day here.

And though *New York v. New Jersey*, 598 U.S. 218 (2023), applied *Tarrant*'s principle to a bistate entity, that case is inapt here. *New York v. New Jersey* held that New Jersey could unilaterally withdraw from the Waterfront Commission Compact—a compact between the two states creating an entity to perform certain law-enforcement functions at

19

the Port of New York and New Jersey. 598 U.S. at 220–21. In permitting New Jersey's unilateral withdrawal despite the compact's silence on that question, the Court relied in part on *Tarrant*'s principle that states don't "easily cede" their sovereignty. *Id.* at 225–26. But a state's unilateral *withdrawal* from its delegation of power to a bistate entity is fundamentally different from a state's attempt to unilaterally control that entity, such as by enforcing a fine against it.

Moreover, *New York v. New Jersey* casts doubt on the Department's claim that states always retain all rights not surrendered in the compact. In holding that New Jersey could unilaterally withdraw despite the compact's silence, the Court relied not only on *Tarrant*'s principle, but also on the "default contract-law rule" that "contracts calling for ongoing and indefinite performance may be terminated by either party." *Id.* at 225. But it made clear that the rule doesn't apply to "other kinds of compacts that do not exclusively call for ongoing performance on an indefinite basis—such as compacts setting boundaries, apportioning water rights, or otherwise conveying property interests." *Id.* at 226.

Thus, *New York v. New Jersey* suggests that how to construe silence in a compact depends on the "background principles of law that would have informed the parties' understanding when they entered the Compact." *Id.* at 224; *accord Tarrant*, 569 U.S. at 631 (relying not only on silence in the compact, but also customary practice and the parties' course of dealing). And here, we think that background principle is that bistate entities are not "subject to the unilateral control" of either state. *Hess*, 513 U.S. at 42; *see also HIP*, 693 F.3d at 358 ("By expressly creating the bi-state entity, New York and New Jersey relinquished all control over the Authority unless otherwise stated in the compact.").

20

The Department protests that this result ignores federal preemption principles that displace state law only when there is an express preemption provision or a conflict with state law. We disagree.

In analyzing whether Oklahoma could enforce its law despite the compact in *Tarrant*, the Court treated the preemption question as one of contract interpretation. 569 U.S. at 628 ("Interstate compacts are construed as contracts under the principles of contract law."). And it started from the proposition that it need not apply a "presumption against pre-emption." *Id.* at 631 & n.10. Because such a presumption is rooted in "respect for the States as independent sovereigns," the Court explained that the presumption doesn't apply when "the States themselves have drafted and agreed to the terms of a compact." *Id.* at 631 n.10 (cleaned up). Instead, the Court interpreted the compact by looking to relevant background principles, customary practice, and the parties' course of dealing. *Id.* at 631.

We've taken a similar approach here, and conclude that the Department's attempt to enforce Virginia safety regulations against the Authority conflicts with the purpose of the Compact.[8]

---

[8] Though *Tarrant* also looked to customary practice and the parties' course of dealing, those tools are no help here. Neither party invokes the practices of other bistate entities. And on this record, the parties' course of dealing is ambiguous at best. The parties stipulated in the administrative proceedings that since "at least" 2006, the Authority has claimed that the Department has no authority over it but has instead voluntarily complied with the Department's supervision. J.A. 28. The Department suggests that it regulated the Authority prior to 2006 without objection. But it cites only one instance where the Department inspected an Authority facility in 1995—eight years into the Authority's control of the airports. Reply Br. at 27 & n.3. Though the Department's adjudicator in the administrative proceedings referenced seven citations issued prior to 2006, J.A. 17 & n.1, neither the adjudicator nor the Department identifies these instances nor indicates whether

21

D.

The Department argues that it would be "anomalous to conclude that the [Compact] intended to leave the 1,700 [Authority] workers without any safety protections." Appellant's Br. at 22. But the Authority is governed by a board of directors consisting of members appointed by the Governor of Virginia, the Mayor of the District of Columbia, the Governor of Maryland, and the President. 49 U.S.C. § 49106(c).

We think it reasonable that the Compact would leave to this representative body the task of protecting its employees. In any event, this type of policy argument can't override the text and structure of the Compact. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188 (1994).

\* \* \*

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

---

the Authority complied with the citation. In any event, we don't think these handful of interactions are telling.

22