**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1384

MERIDIAN INVESTMENTS, INC.,

Plaintiff − Appellant,

v.

FEDERAL HOME LOAN MORTGAGE CORPORATION; FEDERAL HOUSING FINANCE AGENCY, Conservator for Federal Home Loan Mortgage Corporation,

Defendants − Appellees.

--------------------------------------

TIMOTHY HOWARD,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:15−cv−01463−JCC−TCB)

Argued: March 22, 2017                     Decided: April 28, 2017

Before NIEMEYER, DUNCAN, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Niemeyer and Judge Harris joined.

**ARGUED:** Jay Ian Igiel, NEALON & ASSOCIATES, P.C., Alexandria, Virginia, for Appellant. Howard N. Cayne, ARNOLD & PORTER LLP, Washington, D.C., for Appellees. **ON BRIEF:** Robert B. Nealon, NEALON & ASSOCIATES, P.C., Alexandria, Virginia, for Appellant. Asim Varma, David B. Bergman, Ian S. Hoffman, ARNOLD & PORTER LLP, Washington, D.C., for Appellee Federal Housing Finance Agency. Graciela M. Rodriguez, Merritt E. McAlister, Taylor T. Lankford, KING & SPALDING LLP, Washington, D.C., for Appellee Federal Home Loan Mortgage Corporation. Geoffrey T. Hervey, BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC, Bethesda, Maryland, for Amicus Curiae.

———————

DUNCAN, Circuit Judge:

The genesis of this appeal is an unconsummated business deal between Meridian Investments, Inc. ("Meridian") and Federal Home Loan Mortgage Corporation ("Freddie Mac"). The district court dismissed Meridian's breach-of-contract suit against Freddie Mac and the Federal Housing Finance Agency ("FHFA") (collectively, "Defendants"). For the reasons that follow, we affirm.

I.

A.

Congress created Freddie Mac in 1970 to facilitate access to mortgage credit and foster competition in the secondary market for residential mortgages. Freddie Mac has always existed as a private, federally chartered corporation. Freddie Mac, and its sister-corporation, Federal National Housing Association ("Fannie Mae"), purchase and securitize residential mortgages, freeing up capital for private lenders to make more loans. Since 1989, Freddie Mac has operated as a publicly traded company.

By 2008, Freddie Mac and Fannie Mae together held or guaranteed over $5 trillion of home mortgage debt, but the American housing market crash and resulting financial crisis threatened to bankrupt both entities. To save Freddie Mac from collapse, Congress passed the Housing and Recovery Act of 2008 ("the Act"), Pub. L. No. 110-289, 122

Stat. 2654 (codified as amended in scattered sections of 12 U.S.C.).[1] The Act established FHFA, an independent government agency charged with supervising Freddie Mac. 12 U.S.C. § 4511. The Act also gave FHFA and its Director broad powers to address Freddie Mac's financial situation, including the ability to appoint FHFA as conservator or receiver "for the purpose of reorganizing, rehabilitating, or winding up" Freddie Mac's affairs. *Id.* § 4617(a)(1)–(2).

On September 6, 2008, FHFA's Director exercised that authority and placed Freddie Mac into conservatorship. Thereafter, as conservator, FHFA "immediately succeed[ed] to all rights, titles, powers, and privileges" of Freddie Mac. *Id.* § 4617(b)(2)(A). As conservator, FHFA also could "take over the assets of and operate" as well as "conduct all business of" Freddie Mac. *Id.* § 4617(b)(2)(B). Pursuant to this authority, on September 7, 2008, FHFA entered into a Senior Preferred Stock Purchase Agreement ("PSPA") with the United States Treasury. Under the PSPA, Treasury provided Freddie Mac with a multi-billion dollar line of credit, which Freddie Mac needed to remain solvent. In return, Freddie Mac gave Treasury $1 billion of senior preferred stock and agreed to certain restrictive covenants. As relevant to this appeal, the PSPA prohibited Freddie Mac from selling, conveying, or transferring any assets without Treasury's prior consent.

---

[1] The relevant Act provisions relate to both Freddie Mac and Fannie Mae. Because this appeal only concerns Freddie Mac, we limit our discussion to that entity.

B.

In October 2008, Meridian approached FHFA about a possible financial transaction involving Freddie Mac's Low Income Housing Tax Credits ("LIHTC"). LIHTCs provide investors in affordable housing tax credits to apply against profits on their federal tax returns. As Freddie Mac was unlikely to be profitable in the near future, however, it would not be able to use its LIHTCs. Therefore, Meridian proposed a deal whereby it would purchase Freddie Mac's $3 billion LIHTC portfolio for $3.4 billion. As is customary with large, complex financial transactions, the parties first negotiated a Memorandum of Understanding ("MOU"). The MOU broadly outlined the basics of the transaction, titled Project America. Three MOU provisions are relevant to this appeal.

Paragraph 3(a) states that "[u]pon execution of this MOU, Freddie Mac shall promptly consult with, and to the extent required, exercise commercially reasonable efforts to obtain applicable consent from, FHFA to proceed with the transactions contemplated by this MOU. . . . The Parties agree to take all commercially reasonable efforts to execute definitive documents . . . as soon as possible hereafter." J.A. 38. In Paragraph 7, "[t]he Parties acknowledge and understand that future actions are required in order to implement and comply with the terms of this MOU." J.A. 40. Finally, Paragraph 12, titled "**NON-BINDING**" states:

> Notwithstanding the terms of this MOU, or any other past, present or future written or oral indications of assent or indications of results of negotiation or agreement to some or all matters then under negotiation, it is agreed that no Party hereto (and no person or entity related to any such Party) will be under any legal obligation with respect to the proposed transaction or any similar transaction, unless and until formal written definitive agreements have been executed and delivered by all Parties intending to be

5

bound; provided, however, that the obligations set forth in paragraph 1(j) and paragraphs 4, 6, 7, 8, 9, 10, 11 and 12 (the "Binding Provisions") hereof will be binding on the Parties upon execution and delivery of this MOU in accordance with the terms hereof.

J.A. 41.

Meridian and Freddie Mac signed the MOU on June 1, 2009. Over the next five months, both parties worked diligently toward executing a final formal agreement. As required under securities laws, Meridian prepared a Private Placement Memorandum for prospective investors, which detailed Project America's terms, tax considerations, and risk factors. As part of the general risks, the Private Placement Memorandum acknowledged Freddie Mac's PSPA with Treasury and noted that "[u]ntil Freddie Mac pays or redeems the senior preferred stock in full, certain actions require the prior written consent of the Treasury, including, but not limited to the ability to sell, transfer or otherwise dispose of any assets, including its interest" in the LIHTC portfolio. J.A. 211. Meridian also warned prospective investors that "[t]o the extent the Treasury does not approve the sale of the [LIHTC Portfolio] or delays such approval, the Closing will not occur and the Tax Credits expected to be realized may be adversely affected." J.A. 211–12.

Ultimately, Treasury did not approve Project America. On November 23, 2009, FHFA's Acting Director informed Freddie Mac that, after discussing Project America with Treasury, Treasury would not consent to the project. As such, the deal could not move forward. On February 18, 2010, FHFA informed Freddie Mac that it could not sell

6

or transfer its LIHTC portfolio by any means. Accordingly, Freddie Mac wrote down the carrying value of its LIHTC portfolio to zero as of December 31, 2009.

## C.

Nearly six years later, Meridian filed a complaint against Freddie Mac and FHFA, alleging that Defendants (1) breached the MOU by not completing Project America; (2) failed to satisfy certain MOU obligations; and (3) breached the implied covenants of good faith and fair dealing. Defendants moved to dismiss, which the district court granted on three different bases. First, the district court found that Virginia's five-year statute of limitations for contract actions, Virginia Code Section 8.01-246(2), barred Meridian's claim. Second, the district court concluded that, even if the action were not time-barred, Meridian's complaint failed to state a cause of action because the MOU is, under Virginia law, only an unenforceable "agreement to agree." J.A. 251. Third, the district court alternatively determined that, even if the MOU were enforceable, it contained two conditions precedent: (1) an executed formal written agreement and (2) FHFA approval. Because neither of these conditions occurred, Defendants were not bound to complete the transaction. Meridian timely appealed only Count II of its complaint, alleging that Defendants breached various provisions of the MOU.

## II.

## A.

Before reaching the merits, we must first address the threshold issue of whether, as the district court determined, the action is time-barred under the five-year Virginia statute

7

of limitations. Meridian urges us to instead apply the six-year statute of limitations in 28 U.S.C. § 2401(a) for contract suits brought "against the United States." Meridian also contends that the statute of limitations is an affirmative defense that cannot be raised in the context of a motion to dismiss. We disagree as to both, but address the latter argument first.

A defendant's claim that an action is time-barred is an affirmative defense that it can raise in a motion to dismiss when the "face of the complaint includes all necessary facts for the defense to prevail." *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 850–51 (4th Cir. 2016) (citation omitted). Meridian's argument against applying Virginia law--that Defendants are the "United States"--is a legal, not a factual question. All facts necessary to decide whether Defendants' statute-of-limitations defense applies, including when the cause of action first accrued, appear on the face of the complaint. We may therefore reach the affirmative defense in reviewing the district court's dismissal of the action.

B.

Whether the five-year state statute or the six-year federal statute applies turns on whether this is a suit between private parties or a private party and the United States. As discussed below, we conclude that it is an action between two private corporations.

Section 2401(a) requires parties to bring civil actions other than tort claims "against the United States . . . within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Section 2401 is part of the Tucker Act, ch. 359, 24 Stat. 505 (codified as amended in scattered sections of 28 U.S.C.), which Congress enacted to

8

allow private claims against the government, including contract claims. *See* 28 U.S.C. § 1491(a)(1).[2] The Tucker Act consists of the "Big" Tucker Act, 28 U.S.C. § 1491, which vests exclusive jurisdiction in the Court of Federal Claims for actions against the United States in excess of $10,000, and the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2), which grants concurrent jurisdiction to federal district courts for claims less than $10,000 brought against the United States. Section 2401(a) serves as the internal time limitation for the Little Tucker Act only. *See Herr v. U.S. Forest Serv.*, 803 F.3d 809, 816 (6th Cir. 2015). Thus, a claim is only subject to § 2401(a)'s statute of limitations if it is "against the United States" as that term is construed in the Little Tucker Act. "United States" under the Little Tucker Act includes federal agencies and instrumentalities acting pursuant to statutory authority to accomplish a governmental objective. *Corr v. Metro. Wash. Airports Auth.*, 702 F.3d 1334, 1336–37 (Fed. Cir. 2012). Congress created Freddie Mac as a private corporation. The only question here, therefore, is whether Defendants' actions have transformed Freddie Mac into a government instrumentality. We hold that they have not.

---

[2] Prior to the Tucker Act, private parties had to present their grievances against the United States to Congress for relief on a case-by-case basis. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983). The inadequacy and inefficiency of this process led Congress to establish the Court of Claims in 1855, and, in 1863, to provide authority for the Court of Claims to render final judgments. *Id.* at 213. In 1887, Congress passed the Tucker Act, which, *inter alia*, enlarged the jurisdiction of the Court of Claims and provided a six-year statute of limitations. H.R. Rep. No. 49-1077, at 4 (1886). Congress renamed the court the Court of Federal Claims in 1992. *See* Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902(a) (2), 106 Stat. 4506.

C.

Although "there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a[n] . . . instrumentality," the Supreme Court has provided guidance. *Dep't of Emp't v. United States*, 385 U.S. 355, 358–59 (1966). In *Lebron v. National Rail Road Passengers Corp.*, 513 U.S. 374 (1995), the Supreme Court considered whether Amtrak, a federally chartered corporation, was nonetheless subject to the governmental constraints of the First Amendment. In holding that it was, the Court analyzed the extent to which (1) Amtrak served a government purpose and (2) the government controlled Amtrak. *Id.* at 397. Because Amtrak was "created by a special statute, explicitly for the furtherance of federal governmental goals," it was clear that Amtrak served a government purpose. *Id.* As to control, the Court noted that government appointees controlled Amtrak's board of directors and that Amtrak was "not merely in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be)." *Id.* at 398. As such, the Court distinguished Amtrak, which the government "specifically created . . . for the furtherance of governmental objectives, and not merely holds some shares but controls the operation of the corporation through its appointees," from a situation where the government only acts as a shareholder. *Id.* at 399. In the former, the government exerts control "not as a creditor but as a policymaker." *Id.*; *see also Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225, 1231–33 (2015) (holding that Amtrak is a governmental entity for separation of powers purposes because of pervasive government control). Albeit

10

dicta, we find the Court's language instructive here. Applying the reasoning of *Lebron* to both Defendants, we conclude that neither is a federal instrumentality.

First, though Freddie Mac undeniably has a public purpose, the government does not exert control over Freddie Mac such that it loses its private-party status. Unlike Amtrak in *Lebron*, the voting common shareholders elect Freddie Mac's 13 board members annually. 12 U.S.C. § 1452(a). Moreover, although the government does exert some control over Freddie Mac through the PSPA with Treasury, that control is temporary, "as a private corporation whose stock comes into federal ownership might be." *Lebron*, 513 U.S. at 398. The Supreme Court has long held that, when the government acquires an ownership interest in a corporation, it acts--and is treated--as any other shareholder. *See, e.g.*, *Bank of U.S. v. Planters' Bank of Ga.*, 22 U.S. 904, 907 (1824). Under *Lebron*, a private corporation morphs into a federal instrumentality when it is "Government-created *and* controlled." *Lebron*, 513 U.S. at 394 (emphasis added). The fact that Freddie Mac is not government controlled informs our decision that it is not a federal instrumentality. *See also Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1406–1409 (9th Cir. 1996) (holding that Freddie Mac is not a government agency subject to the Due Process Clause).

Second, though FHFA is a federal agency, as conservator it steps into Freddie Mac's shoes, shedding its government character and also becoming a private party. *See Montgomery Cty. v. Fed. Nat'l Mortg. Ass'n*, 740 F.3d 914, 919 n.* (4th Cir. 2014); *cf. Atherton v. FDIC*, 519 U.S. 213, 225 (1997) (declining to find a federal interest in a case involving the FDIC "acting only as receiver of a failed institution" rather than "pursuing

11

the interest of the Federal Government as a bank insurer"). Here, Meridian principally argues that Treasury was acting as a policymaker rather than a creditor. Treasury, however, is not a named defendant in this action. The only actions relevant to this appeal are those of Freddie Mac and FHFA. It is evident from the face of the complaint that Defendants are not the United States for the purposes of 28 U.S.C. § 2401(a). Therefore, we hold that Virginia's five-year statute of limitations, not § 2401(a), applies. Because the parties acknowledge that more than five years passed between when the alleged injury accrued and Meridian's complaint, we agree with the district court that the instant claim is time-barred.[3]

### III.

### A.

Alternatively, even if the instant claim were not time-barred, it would still fail. We review a district court's dismissal for failure to state a claim de novo. *Leichling*, 842 F.3d at 850. Such review assumes all factual allegations in the complaint are true, and we draw all reasonable inferences in Meridian's favor as the nonmovant.

---

[3] We also note that a contrary result would not assist Meridian. If § 2401(a) did apply, the Court of Federal Claims and the Federal Circuit would have exclusive jurisdiction. *See Portsmouth Redevelop. & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983). We reject Meridian's contention that we can use the Little Tucker Act for statute-of-limitation purposes without using it for subject-matter jurisdiction; the Federal Circuit has exclusive jurisdiction over any appeal where lower-court jurisdiction "was based, in whole or in part" on the Tucker Act. 28 U.S.C. § 1295(a)(2).

12

B.

In alleging a breach of contract, Meridian faces an uphill battle where the operative document here is a memorandum of understanding. Letters of intent and memoranda of understanding are generally unenforceable "agreement[s] to agree" under Virginia law. *W.J. Schaefer Assocs., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997). This is particularly true when, as here, both parties agree in the document to negotiate in good faith toward a final contract. *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 493 (E.D. Va. 2002). However, parties can include binding provisions in a MOU so long as there is "mutual assent of the contracting parties to terms reasonably certain under the circumstances to have an enforceable contract." *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981). An agreement to negotiate in good faith is not sufficiently concrete to give rise to an obligation, but a provision that has more definite obligations, such as a confidentiality or nonsolicitation provision, can be binding even in a MOU. *See Marketplace Holdings, Inc. v. Camellia Food Stores, Inc.*, 64 Va. Cir. 144, 147 (Va. Cir. Ct. 2004).

In Paragraph 12 of the MOU, the parties anticipated that the memorandum would be nonbinding, except for the specifically enumerated "obligations set forth in paragraph 1(j) and paragraphs 4, 6, 7, 8, 9, 10, 11, and 12 (the Binding Provisions)." J.A. 41. Meridian argues that Defendants breached the MOU by either not formally seeking Treasury's approval or by not trying with sufficient diligence to persuade Treasury to

approve Project America.[4]  The former is not supported by the record and Defendants were not bound to the latter.

First, FHFA's denial letter to Freddie Mac saying that it had "discussed the Project America transaction with Treasury" but that Treasury refused to consent undercuts Meridian's argument that Defendants did not seek Treasury's approval.  J.A. 58. Because Meridian attached the denial letter and relied on it in the complaint, the district court properly considered it in granting Defendants' Rule 12(b)(6) motion.  *See Anand v. Ocwen Loan Serv., LLC*, 754 F.3d 195, 198 (4th Cir. 2014).  Meridian's conclusory allegations to the contrary, without more, cannot defeat the motion to dismiss.  *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 191 (4th Cir. 2010).

Second, Defendants had no obligation to persuade Treasury to consent to Project America.  Meridian bases this claim on Paragraphs 3 and 7 of the MOU, arguing that, because FHFA's consent depended on Treasury's consent, FHFA was required to convince Treasury to sign off on Project America.  Though Paragraph 3 required Freddie Mac to "exercise commercially reasonable efforts to obtain applicable consent from[] FHFA to proceed with Project America," J.A. 38, the parties did not include that paragraph as part of the Binding Provisions.  Meridian argues that Paragraph 3 is binding on the parties through Paragraph 7, which required the parties to "cooperate and take

_____

[4] Meridian also alleges that Project America did not depend on Treasury's approval.  However, we find this argument implausible given Meridian's Private Placement Memorandum to prospective investors, which acknowledged that Freddie Mac required "the prior written consent of the Treasury" in order "to sell, transfer or otherwise dispose of any assets, including its interest" in the LIHTC portfolio.  J.A. 211.

such reasonable actions . . . as may be necessary or appropriate to structure and complete" Project America. J.A. 40. However, because the Binding Provisions specifically did not include Paragraph 3, Meridian's circuitous attempt to make it obligatory fails. We read unambiguous provisions in a contract according to their plain meaning, and here the parties' identification of certain provisions as binding necessarily implies the parties' intent not to be bound by the remaining provisions. *See Bentley Funding Grp., LLC v. SK & R Grp., LLC*, 609 S.E.2d 49, 56 (Va. 2005). Some of the MOU's provisions may have been binding on the parties, but Meridian has not demonstrated that Defendants breached any of them.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.