**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1735

PHIL KERPEN, Individually and on Behalf of All Others Similarly Situated; AUSTIN RUSE, Individually and on Behalf of All Others Similarly Situated; CATHY RUSE, Individually and on Behalf of All Others Similarly Situated; CHARLOTTE SELLIER, Individually and on Behalf of All Others Similarly Situated; JOEL SELLIER, Individually and on Behalf of All Others Similarly Situated; MICHAEL GINGRAS, Individually and on Behalf of All Others Similarly Situated,

        Plaintiffs – Appellants,

    v.

METROPOLITAN WASHINGTON AIRPORTS AUTHORITY; ELAINE L. CHAO, in her official capacity as Secretary of Transportation; UNITED STATES DEPARTMENT OF TRANSPORTATION,

        Defendants – Appellees,

DISTRICT OF COLUMBIA,

        Intervenor – Appellee,

KARL ANTHONY RACINE,

        Intervenor/Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:16-cv-01307-JCC-TCB)

Argued: September 27, 2018                Decided: October 22, 2018

Before WILKINSON, DUNCAN, and KEENAN, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Keenan joined.

---

**ARGUED:** Gene C. Schaerr, SCHAERR | DUNCAN LLP, Washington, D.C., for Appellants. Stuart Alan Raphael, HUNTON & WILLIAMS LLP, Washington, D.C., for Appellee Metropolitan Washington Airports Authority. Lewis Yelin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees Elaine Chao and United States Department of Transportation. **ON BRIEF:** Robert J. Cynkar, Patrick M. McSweeney, Christopher I. Kachouroff, MCSWEENEY, CYNKAR & KACHOUROFF PLLC, Woodbridge, Virginia; S. Kyle Duncan, Stephen S. Schwartz, Michael T. Worley, SCHAERR | DUNCAN LLP, Washington, D.C., for Appellants. Philip G. Sunderland, Office of General Counsel, METROPOLITAN WASHINGTON AIRPORTS AUTHORITY, Washington, D.C.; Sona Rewari, HUNTON & WILLIAMS LLP, Washington, D.C., for Appellee Washington Metropolitan Airports Authority. Chad A. Readler, Acting Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Steven G. Bradbury, General Counsel, Paul M. Geier, Assistant General Counsel for Litigation and Enforcement, Joy K. Park, UNITED STATES DEPARTMENT OF TRANSPORTATION, Washington, D.C.; Tracy McCormick, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Federal Appellees. Mark R. Herring, Attorney General, Stephen A. Cobb, Deputy Attorney General, Toby J. Heytens, Solicitor General, Matthew R. McGuire, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Curiae.

---

WILKINSON, Circuit Judge:

Appellants here have raised a variety of constitutional and statutory challenges to Metropolitan Washington Airport Authority's (MWAA) ability to use toll revenues to fund projects enhancing access to Dulles airport. The district court granted defendants' motion to dismiss all of these claims, and we now affirm its judgment.

I.

In 1950, the federal government began to build Dulles Airport. Recognizing that access to the airport was as important as the airport itself, the government also acquired a right of way to begin building an access road, linking Dulles to two of the major highways serving the Washington, D.C. region. In 1962, the airport and the access road were opened under the management of the Federal Aviation Administration.

In 1983, the federal government gave Virginia an easement to build a toll road through the right of way previously acquired for the access road. The federal government determined that the new toll road would help mitigate increasing congestion in the vicinity of Dulles. The road was opened one year later and was operated by the Commonwealth of Virginia.

By 1984, the federal government was concerned that needed capital improvements at Dulles, and its sister airport National, could not be funded. The solution, devised by a Commission created at the behest of the Secretary of Transportation, was to transfer control of both airports to an authority with the ability to raise money by selling tax-exempt bonds. The next year, Virginia and the District of Columbia passed reciprocal laws to create an interstate compact for the management of Dulles and National.

3

Congress had already consented to the compact in 1959, when it gave advance approval to interstate compacts for the management of airports. Act of Aug. 11, 1959, Pub. L. No. 86-154, 73 Stat. 333 (1959). The result of this compact was the Metropolitan Washington Airport Authority (MWAA).

MWAA was authorized by its organic state laws to acquire National and Dulles from the federal government. Additionally, MWAA was granted powers to operate, maintain, and improve National and Dulles airports, including the power to issue revenue bonds and collect various charges for the use of the airports. Va. Code § 5.1-156; D.C. Code § 9-905(a). MWAA was originally overseen by a Board of Review consisting of Members of Congress. But after two successful challenges the Board was dismantled, leaving the Board of Directors in control. *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991); *Hechinger v. Metro. Wash. Airports Auth.*, 36 F.3d 97, 99, 101 (D.C. Cir. 1994). The Board of Directors, as currently constituted, has seven members appointed by the Governor of Virginia, four appointed by the Mayor of the District of Columbia, three appointed by the Governor of Maryland, and three appointed by the President of the United States. Va. Code § 5.1-155(A); D.C. Code § 9-904(a)(1).

In 1986, Congress passed the Transfer Act, which authorized the Secretary of Transportation to lease Dulles and National to MWAA. Pub. L. No. 99-591, 101 Stat. 3341 (1986), *codified as amended at* 49 U.S.C. §§ 49101-49112. The Act also authorized the transfer of the airports' "access highways and other related facilities," 49 U.S.C. § 49102(a), specifically to include the right of way over which the access road and toll

4

road were built. 49 U.S.C. § 49103 (4). The Transfer Act also specified the terms under which the Secretary could lease National and Dulles to MWAA, requiring that, as a condition of the transfer, MWAA must only use the property for "airport purposes." 49 U.S.C. § 49104(a)(2)(B). "[A]irport purposes" were in turn defined to include "activities necessary or appropriate to serve passengers or cargo in air commerce" and "a business or activity not inconsistent with the needs of aviation that has been approved by the Secretary." 49 U.S.C. § 49104(a)(2)(A)(ii), (iv).

The Transfer Act also required MWAA to "assume responsibility" for the Master Plan developed by the federal government for National and Dulles. 49 U.S.C. § 49104(a)(6)(A). The Plan was concerned with the management of the airports, and included provisions that were designed to ensure that passengers and cargo had access to them, in spite of increasing congestion. One of these provisions contemplated an eventual extension of metro service from Washington to Dulles.

In 2006, metro service to Dulles was becoming a reality. The long-planned Silver Line, which would connect Dulles to Washington, was coming to fruition. In service of this project, Virginia agreed to transfer operation of the toll road to MWAA, and MWAA agreed that it would use revenues from the road to finance construction of the Silver Line, as well as other transportation improvements near Dulles. In 2008, the Secretary of Transportation certified that this arrangement did not violate the terms of the Lease.

Virginia's agreement with MWAA inspired three legal challenges before this one. First was a state law challenge that unsuccessfully tried to have a state court declare MWAA's collection of tolls violated the Virginia Constitution. *Gray v. Virginia*

5

*Secretary of Transportation*, 662 S.E.2d 66, 100, 107 (Va. 2008). A second case advanced substantially the same argument and was dismissed by this court. *Parkridge 6, LLC v. U.S. Dept. of Transp.*, 420 F. App'x 265, 267 (4th Cir. 2011). The third case, *Corr v. Metropolitan Washington Airports Authority*, raised many of the claims presented here. 800 F. Supp. 2d 743, 751 (E.D. Va. 2011). The district court rejected each one, finding that MWAA's structure did not violate the non-delegation doctrine, the Appointments Clause, or the Guarantee Clause. *Id.* at 756-58. Plaintiffs appealed to the Federal Circuit, but that court held that MWAA is not a federal instrumentality and so jurisdiction was inappropriate. *Corr v. Metro. Wash. Airports Auth.*, 702 F.3d 1334, 1338 (Fed. Cir. 2012).

Appellants here (and plaintiffs below) bring a putative class action by users of the toll road and other airport facilities. Their lawsuit presented a bouquet of statutory and constitutional claims. Important for this appeal are the assertions that MWAA is a federal instrumentality, that MWAA violated Article I, Article II, and the Guarantee Clause of the Constitution, that MWAA violated the Administrative Procedures Act, and that MWAA violated the terms of the Transfer Act and the Lease by using toll revenues to build the Silver Line. The district court dismissed all claims. *Kerpen v. Metro. Wash. Airports Auth.*, 260 F.Supp.3d 567, 588 (E.D.Va 2017). Applying *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995), the court concluded that MWAA was not a federal instrumentality and it did not exercise federal power. *Kerpen*, 260 F.Supp.3d at 580. In the view of the district court, this was fatal to the non-delegation, Appointments Clause, and APA claims. *Id.* at 583-84, 586. The court also dismissed the

claims based on the Lease and the Transfer Act, reasoning that metro from Washington to Dulles was a permissible airport-related expenditure. *Id.* at 586. Plaintiffs now appeal this dismissal.

II.

Appellants claim as a threshold matter that MWAA is a federal entity. Applying the standard from *Lebron v. National Railroad Passenger Corporation* we conclude that it is not. 513 U.S. 374 (1995)

In *Lebron*, the Supreme Court explained that entities that are both created and controlled by the federal government may be considered federal entities that are subject to the limitations of the Constitution. *Lebron*, 513 U.S. at 397. This first prong of *Lebron* is satisfied by an entity that was "created by a special statute, explicitly for the furtherance of federal governmental goals." *Id.* The second is satisfied only when an entity's operations are "controlled" by federal government appointees. *Id.* at 396. Mere influence is not sufficient; to satisfy this prong the federal government must be the "policymaker" for the entity, rather than simply an influential stakeholder. *Id.* at 398, 399. Temporary control—as when the federal government steps in as a conservator—is not sufficient. *Id.* at 398; *Meridian Investments v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017). Only those entities that satisfy both conditions may be considered federal entities. *Lebron*, 513 U.S. at 398. *See also Meridian Investments,* 855 F.3d at 579. ("Under *Lebron*, a private corporation morphs into a federal instrumentality when it is Government-created *and* controlled.") (citation and internal quotation marks omitted).

7

MWAA does not satisfy either prong. In the first place, MWAA was not created by the federal government. The federal government never passed a "special law" to create it. Rather, Virginia and the District of Columbia, acting on a recommendation from a commission appointed by the Secretary of Transportation, created MWAA when they passed reciprocal laws in 1985. The federal government had pre-approved the agreement in 1959, when it passed a law giving advance consent to regional compacts for the management of airports. The federal Transfer Act does not satisfy *Lebron*'s creation prong for the simple reason that the Act did not create MWAA. It conferred no powers on MWAA; it simply specified the minimum powers MWAA must have in order to lease Dulles and National. 49 U.S.C. § 49106(a)(1)(B). The text of the Act recognized that these powers originated with Virginia and the District of Columbia. 49 U.S.C. § 49106(a)(1)(A). MWAA is, therefore, a textbook example of an interstate compact. Its history shows plainly that it is not a creature of the federal government.

*Lebron*'s second condition is unsatisfied as well: MWAA is not controlled by the federal government. The Board of Review, which provided for on-going federal control over MWAA, was invalidated in the early 1990's. *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc*., 501 U.S. 252, 276-77 (1991); *Hechinger v. Metro. Wash. Airports Auth.*, 36 F.3d 97, 105 (D.C. Cir. 1994). The federal government appoints just three out of seventeen members of MWAA's Board of Directors. Because these appointees are a distinct minority of the Board, they alone cannot "control" MWAA. Through the process of deliberation and negotiation, these appointees could influence MWAA's operations, but influence is not sufficient. Federal

8

*control* is required to meet *Lebron*'s second prong, and federal control is not present here. The Federal Circuit agreed on this point in *Corr v. MWAA* when it wrote that, "[t]he fact that a small minority of the board members are federal appointees is insufficient to establish MWAA as a federal instrumentality." 702 F.3d 1334, 1337 (Fed. Cir. 2012).

None of the facts advanced by appellants are sufficient to convert MWAA into a federal instrumentality. An entity that leases property from the federal government, like MWAA, does not, by virtue of that lease, become a federal entity. *See Buckstaff Bath House Co. v. McKinley*, 308 U.S. 358, 362 (1939). Nor does an ordinary contractor with the federal government, by virtue of the contract, become a federal entity. *See United States v. New Mexico*, 455 U.S. 720, 739-40 (1982). Federal oversight of an entity, like the Secretary of Transportation's oversight of MWAA, does not convert an entity into a federal one. *See Meridian Investments*, 855 F.3d at 575, 579 (holding that Freddie Mac is not a federal entity despite supervision by FHFA). And conditions attached to federal funds, like the conditions on MWAA's federal funding, do not convert the recipient of those funds into a federal entity. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 833, 843 (1982) (holding that a recipient of federal funds is not bound by the First Amendment). If we adopted appellants' view on any one of these points, it would auger a wholesale transfer of authority to the federal government from states and local government. We decline to do so.

Finally, appellants argue that MWAA is a federal instrumentality because the federal government has a "strong and continuing interest" in ensuring that members of Congress and other federal employees have access to the nation's capital. Brief for the

Appellants at 26 (citing *Metro. Wash. Airports Auth. v. Citizens for Abatement of Airport Noise*, 501 U.S. 252, 266 (1991)). But of course, the federal government has an "interest" in a great many things. A federal interest does not convert an entity into a federal instrumentality. And, at the very least, the interest here is one that is shared by the residents of Maryland, the District of Columbia, and Virginia.

Interstate compacts—even those that envision a cooperative relationship with the federal government—are not federal entities. In an increasingly interconnected world, challenges which were once thought to be purely local are in fact regional in character. Single states are often ill-equipped to meet regional challenges like the reduction in marine fisheries, *see* Atlantic States Marine Fisheries Commission (approved at Act of May 4, 1942, Pub. L. No. 77-539, 56 Stat. 267 (1942)), or the draining of the Great Lakes, *see* The Great Lakes Compact (approved at Act of Oct. 3, 2008, Pub. L. No. 110-342, 122 Stat. 3739 (2008)). These challenges demand a regional response, and interstate compacts allow states to act in concert to supply one. Multi-state endeavors such as MWAA are a creative means of meeting regional needs. And though they may entail sharing of responsibilities or cooperation among governments, they remain wholly constitutional.

Appellants' failure to meet the threshold of establishing MWAA as a federal entity is fatal to their claims under the Appointments Clause and the Administrative Procedures Act. Both these provisions apply to federal entities—"Officers of the United States," U.S. Const. Art II. § 2, and "author[ities] of the Government of the United States," 5 U.S.C.

10

§ 551(1), respectively. Accordingly, they have little relevance when, as here, the entity in question is not a federal one.

III.

Appellants argue that MWAA's structure violates the non-delegation principle because it has been wrongly delegated "legislative power," "government power," or "federal power." Brief for the Appellants at 13. Because MWAA exercises no power assigned elsewhere by the Constitution, we conclude that it does not violate that principle. We shall take up each of the challenged delegations in turn.

A.

The principle of non-delegation requires that "core governmental power must be exercised by the Department on which it is conferred and must not be delegated to others in a manner that frustrates the constitutional design." *Pittston v. United States*, 368 F.3d 385, 394 (4th Cir. 2004). Legislative power is an example of such a "core" function that may not be delegated to another Department. Article I §1 of the Constitution confers "[a]ll Legislative powers" on Congress. "This text permits no delegation of those powers." *Whitman v. Whitman Trucking Assn.*, 531 U.S. 457, 472 (2001). Of course, Congress does not impermissibly delegate power every time "it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby v. United States*, 500 U.S. 160, 165 (1991). So long as Congress cabins this discretion with an "intelligible principle," no wrongful delegation has taken place. *J.W. Hampton Jr., Co. v. United States*, 276 U.S. 394, 409 (1928). In these instances, Congress has not unlawfully delegated any power; it has simply assigned a responsibility to another branch, which

11

may lawfully exercise its inherent discretion to fulfill the assigned responsibility. *Loving v. United States*, 517 U.S. 748, 777 (1996) (Scalia, J. concurring in part and concurring in the judgment).

An "intelligible principle" need not be exactingly precise to satisfy the requirements of the non-delegation principle. Quite the opposite: a "broad standard[]" will sufficiently cabin another Department's discretion. *Mistretta v. United States*, 488 U.S. 361, 373 (1989). For example, Congress' command that regulation serve the "public interest, convenience, or necessity" has been held to serve as an intelligible principle, *id.* (*citing Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 225-26 (1943)), as has a command to set rates that are "just and reasonable," *id.* at 373-74 (*citing Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944)).

MWAA has not been delegated "legislative power" from the federal government. Under the text of MWAA's reciprocal organic state laws and the Transfer Act, MWAA exercises only those powers conferred on it by its state creators, not the federal government. Va. Code § 5.1-153 and D.C. Code § 9-902 (conferring powers). *See also* 49 U.S.C. § 49106(a)(1)(A) (recognizing those state powers). And even if some of MWAA's powers did come from the federal government, whatever policymaking discretion the Authority wields would be amply constrained by Congress' passage of the Transfer Act. That Act requires that leased property be used only for "airport purposes," defined by Congress to mean "aviation business or activities," "activities necessary or appropriate to serve passengers or cargo in air commerce," or "nonprofit, public use facilities that are not inconsistent with the needs of aviation." 49 U.S.C. § 49104(a)(2)(A). The strictures of

12

the Transfer Act are sufficiently detailed as to more than satisfy the requirement of an "intelligible principle."

B.

The Constitution also forbids delegation of "core governmental power" to a private entity. Unlike the executive and judicial Departments, the Constitution recognizes no governmental powers vested in private entities. The Supreme Court of the mid-1930's found it "obvious" that the exercise of legislative power by private entities was "unknown to our law and is utterly inconsistent with the constitutional prerogatives and duties of Congress," *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 537 (1935), and that such a transfer of power was "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). In *Carter Coal*, for example, the power to regulate the mining industry could not constitutionally be delegated to private mining interests because "in the very nature of things, one person may not be intrusted with the power to regulate the business of another, and especially of a competitor." *Id.* Such regulation is "necessarily a government function" that must constitutionally remain with a public body. *Id.*

We need not examine the continuing vitality of these cases because it is clear that certain governmental powers are not "core" powers and may lawfully be delegated to private parties. For example, in *Pittston v. United* States, we approvingly cited *United States v. Frame*, a Third Circuit case that upheld the exercise of "ministerial" powers by a private party on behalf of the government. *Pittston*, 368 F.3d at 394-95 (*citing United States. v Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989)). We have also recognized that,

13

subject to certain limitations, the government may "delegate its authority [to private entities] to incarcerate, to confine, to discipline, to feed, and to provide medical and other care to inmates who are imprisoned by order of the federal government." *Holly v. Scott*, 434 F.3d 287, 297 (4th Cir. 2006). *See also Rosborough v. Management & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (recognizing prison operation as a "fundamentally governmental function" which may nevertheless be "delegated to private entities.").

There has been no unlawful delegation of "government power" to a private entity in this case for the simple reason that MWAA is not a private entity. It is an interstate compact, constituted by the states. Unlike the mining interests in *Carter Coal*, the Constitution recognizes that the states and their compacts have a large role to play in our scheme of federalist governance. *See* U.S. Const. Art I § 10; *Id.* at Amend. X. Appellants try to analogize MWAA to a private entity on the grounds that it "completely lack[s] accountability[.]" Brief for the Appellants at 51. But the analogy misses the mark. As a creation of the states, MWAA is subject to their dictates in a way that true private entities simply are not. At any time, the elected leaders of Virginia and Washington may amend the compact through reciprocal legislation. Va. Code § 5.1-153; D.C. Code § 9-902. And it is elected officials who appoint MWAA's Board of Directors. Va. Code § 5.1-155(A), (E); D.C. Code § 9-904(a), (e). There may be some level of unaccountability that converts a nominally state entity into a private one, but MWAA's structure is nowhere near it. MWAA is, therefore, a public body which may lawfully exercise governmental power.

14

C.

Finally, appellants argue that MWAA violates the non-delegation principle by exercising "federal power." But there is nothing inherently federal about the operation of commercial airports. In fact, federal operation of a commercial airport is the exception, not the rule: National and Dulles are the only major commercial airports that have been federally operated. It was recognition of the incongruity of the federal government operating a commercial airport that led to the formation of MWAA in the first place. As the district court explained, "operating commercial airports like National and Dulles is a distinctly *un*-federal activity." *Kerpen*, 260 F.Supp.3d at 581.

D.

Successful non-delegation challenges are rare. The Supreme Court has "invoked the doctrine of unconstitutional delegation to invalidate a law only" a handful of times in its history. *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting). This is because the limits of delegation "must be fixed according to common sense and the inherent necessities of the governmental co-ordination." *J.W. Hampton Jr., Co. v. United States*, 276 U.S. 394, 406 (1928). Accordingly, "it is small wonder that [courts] have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting).

We will not "second-guess" MWAA's structure because it does not exercise any powers that the Constitution confers elsewhere. Its framework comports with "common

15

sense" and reflects "the inherent necessities of the governmental co-ordination." *J.W. Hampton Jr., Co.*, 276 U.S. at 406. The constitutional design is not frustrated by an interstate compact's operation of a commercial airport, even when the airport is federal property.

IV.

Appellants next claim that MWAA violates the Guarantee Clause of the U.S. Constitution. Their claim fails because MWAA does not deny any state a republican form of government.

The Guarantee Clause of the U.S. Constitution provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." U.S. Const. Art. IV § 4. This clause is litigated only "infrequent[ly]." *New York v. United States*, 505 U.S. 144, 184 (1992). For the most part, claims premised on the Guarantee Clause present nonjusticiable "political questions," unfit for resolution within the judicial branch. *Id*. But "not all" claims under the Guarantee Clause are nonjusticiable. *Id.* at 185. The question of whether a claim is justiciable is a "difficult" one. *Id.* Where the merits of the claim itself are easily resolved, the Supreme Court has bypassed the justiciability question entirely. *Id.* We take that path today because, even assuming appellants' Guarantee Clause claim is justiciable, it fails on the merits.

MWAA does not deny the people of Virginia, Washington, Maryland, or any other state or subdivision, a republican form of government. "[T]he distinguishing feature" of a republican form of government "is the right of the people to choose their own officers for governmental administration, and pass their own laws." *Duncan v. McCall*, 139 U.S. 449,

16

461 (1891). The Guarantee Clause is not violated when "States … retain the ability to set their legislative agendas" and when "state government officials remain accountable to the local electorate." *New York*, 505 U.S. at 186.

MWAA does not disturb the republican form of government of any of its member jurisdictions. In Virginia, Maryland, and Washington, the "distinguishing feature" of republican government remains. Voters are free to elect their political leaders and those political leaders are free to set their legislative agendas. Even on questions of MWAA's activities, the elected representatives of the people have their say. MWAA exercises only those powers conferred on it by the elected leaders of its member jurisdictions, 49 U.S.C. § 49106(a)(1)(A); Board members are appointed by executive officials accountable to their electorates and serve for a fixed 6-year term, 49 U.S.C. § 49106(c); and MWAA's operations are a frequent topic of discussion in the halls of political power in Virginia, Maryland, and the District of Columbia, *see e.g.*, "Regional coalition rallies for $50 million investment in Dulles," Washington Business Journal (Feb. 4, 2016); "Heavy hitters talk MWAA mess," Politico (Aug. 14, 2012). As the district court in *Corr* explained, MWAA "does not violate Plaintiffs' right to a republican form of government because [MWAA's] authority is circumscribed by legislation and can be modified or abolished altogether through the elected legislatures that created it." 800 F. Supp. 2d at 757.

V.

Appellants claim that MWAA's use of toll road funds to build metro service to Dulles violates the command that funds only be spent on "capital and operating costs of

17

the Metropolitan Washington Airports." 49 U.S.C. § 49104(a)(3). Because we agree with the Secretary of Transportation's interpretation of the Lease and Transfer Act, we reject this argument.

MWAA leases Dulles and National from the federal government under terms specified by the Transfer Act. The Act and the Lease allow MWAA to levy certain fees but require that "all revenues generated by the Metropolitan Washington Airports shall be expended for the capital and operating costs of the Metropolitan Washington Airports." 49 U.S.C. § 49104(a)(3). MWAA also has responsibility for the airports' Master Plan, which, since MWAA was created, contemplated the extension of metro service to Dulles. In 2006, MWAA took over the operation of the toll road leading to Dulles so that it could use the revenues from the road to finance construction of a metro line connecting the airport to Washington, D.C. The question presented by this suit is whether the Act and the Lease allow MWAA to spend those funds for that purpose. We conclude they do.

The expenditures in no way violate the Lease terms. The Secretary of Transportation determined as much in 2008 when she certified MWAA's actions as compliant with the Lease. Her certification expressly contemplated improvements both on and off MWAA's property and concluded that these actions "do not conflict with any terms in the lease[.]" J.A. 416. The Secretary's approval in this case is entitled to "great weight." *Consol. Gas Supply Corp. v. FERC*, 745 F.2d 281, 291 (4th Cir. 1984). As the D.C. Circuit explained, an agency, when interpreting contracts that it is authorized to approve or disapprove, is "entitled to just as much benefit of the doubt in interpreting such an agreement as it would in interpreting its own orders, its regulations, or its

18

authorizing statute." *Cajun Elec. Power Coop. v. FERC*, 924 F.2d 1132, 1135 (D.C. Cir 1991).

It also makes good sense to defer to this determination because it is clear that Congress assigned the Secretary of Transportation a critical role in what, after all, is a transportation matter. The Transfer Act empowers the Secretary in a number of ways: she is responsible for entering into the Lease authorized by the Transfer Act, 49 U.S.C. § 49104(a); she has the power to retake possession of MWAA property that is being improperly used, 49 U.S.C. § 49104(a)(2)(C); and she decides which "business or activity not inconsistent with the needs of aviation" may be considered an "airport purpose" under the terms of the Lease. 49 U.S.C. § 49104(a)(2)(A)(iv). It was pursuant to this critical role that the Secretary of Transportation approved MWAA's use of funds to build metro out to Dulles.

The Secretary's interpretation of the Act and the Lease is plainly a reasonable one, for two reasons. First, the Transfer Act and the Lease command MWAA to "assume responsibility" for the Master Plan for Dulles and National. The version of the Plan in effect at the time of the Act's passage contemplated the extension of metro service to Dulles. Second, the Act and the Lease consent to MWAA's exercise of the power of eminent domain conferred upon it by Virginia. 49 U.S.C. § 49106(b)(1)(D). Congress, therefore, must have imagined that MWAA would make improvements to land that is not owned or controlled by the Authority.

The Secretary's determination conceives practically of an airport as more than just a terminal and runways. It also encompasses a broader infrastructure and critical adjunct

19

improvements that facilitate access to Dulles. Excessive congestion can effectively strangle airport operations and require citizens to spend an ever longer portion of each day making a flight or returning from one. Efforts to alleviate congestion and expand access to facilities in major metropolitan areas often and understandably meet with challenges from those whose lives and properties may be affected by any given project proposal. But some improvements need to be made lest growth overwhelm the ability of the metropolis to deal with it.

There is no basis in law for finding that the dedicated funding mechanism here was impermissible. To find otherwise would throw longstanding airport expansion arrangements into turmoil. We decline to take that step.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

20